**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| **BARBARA WYATT, as next friend of her minor daughter, S.W.,** | § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § | **CIVIL ACTION NO. 6:10cv674** |
| **KILGORE INDEPENDENT SCHOOL DISTRICT, and RHONDA FLETCHER, DOUGLAS DUKE, CASSANDRA NEWELL, in their personal capacities,** | § § § § § | |
| **Defendants.** | § § | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Defendants Kilgore Independent School District ("Kilgore ISD"), and Rhonda Fletcher, Douglas Duke, and Cassandra Newell in their personal capacities, and file this their Motion for Summary Judgment, and would respectfully show unto the Court as follows:

## I. SUMMARY JUDGMENT EVIDENCE

The following evidence is offered in support of this Motion for Summary Judgment:

Exhibit 1     Kilgore ISD Disclosure Documents

Exhibit 2     Deposition testimony of Terry George.

Exhibit 3     Deposition testimony of Jody Clements.

Exhibit 4     Deposition testimony of Douglas Duke.

Exhibit 5     Deposition testimony of Cassandra Newell.

Exhibit 6        Deposition testimony of Rhonda Fletcher.

Exhibit 7        Deposition testimony of Barbara Wyatt.

Exhibit 8        Deposition testimony of S.W.

Exhibit 9        Affidavit of Jalissa Baggett.

Exhibit 10       Affidavit of Harold Ray "Trey" Guin, III.

Exhibit 11       Affidavit of Meagan Youngblood.

Exhibit 12       Affidavit of Summer Williams.

Exhibit 13       Affidavit of Chelsea Warren.

Exhibit 14       Affidavit of Candice Meadows.

Exhibit 15       Affidavit of Mike Moses.

## II.
## INTRODUCTION AND STATEMENT OF FACTS

Kilgore ISD is a school district in Kilgore, Texas, which derives its legal status from the Constitution of the State of Texas and from the Texas Education Code.  (See Exhibit "1" - KISD00903.)  The mission of Kilgore ISD is to "provide an educational climate that strives for excellence and involves a partnership of students, educators, parents, and patrons working together to provide maximum opportunities and encouragement for the development of productive citizens."  (See Exhibit "1" - KISD00907.)

Kilgore ISD is governed by a Board of Trustees ("the Board") which has "exclusive power to govern and oversee the management of" schools.  (See Exhibit "1" - KISD00934.)  Kilgore ISD, through its Board of Trustees ("the Board"), has adopted various missions, goals, and objectives designed to assist in the education of students.  (See Exhibit "1" - KISD00908.)  The Board is responsible for adopting policies governing Kilgore ISD.  (See

Exhibit "2" - George Dep., p. 38, lines 10-14.)  When policies are recommended to the Board, the Board reviews and, if necessary, changes the policies.  (See Exhibit "2" - George Dep., p. 40, lines 1-11; p. 66, lines 24-25; p. 67, lines 1-2; See Exhibit "3" - Clements Dep., p. 109, lines 18-22.)  The policies the Board adopts include Student/Parent Handbooks for the High School.  (*See* Exhibit "1" - KISD00333-KISD00365; See Exhibit "3" - Clements Dep., p. 26, lines 15-25; p. 27, lines 1-10.)   The Handbooks contain acknowledgment forms certifying that parents have read and understood the Handbooks. (See Exhibit "1" - KISD00334.)  In her deposition, Barbara Wyatt testified that each year she received the handbooks, read them, and signed the acknowledgment forms.  (See Exhibit "7" - B. Wyatt Dep., p. 35, lines 3-5; p. 36, lines 1-7.)

It is Kilgore ISD's policy to forbid discrimination or harassment of any kind against any person.  (See Exhibit "2" - George Dep., p. 47, lines 12-17, 23-25; See Exhibit "3" - Clements Dep., p. 116, lines 4-19; See Exhibit "6" - Fletcher Dep., p. 74, line 25; p. 75, lines 1-8; See Exhibit "5" - Newell Dep., p. 94, lines 11-17; See Exhibit "4" - Duke Dep., p. 31, lines 7-23; See Exhibit "1" - KISD00348; KISD01498; KISD01764; KISD01876-KISD01881; KISD01920; KISD01988; KISD02046.)   Apart from the allegations in the present case, no person has ever claimed that any Kilgore ISD employee has discriminated against him or her based on that person's sexual orientation.  (See Exhibit "4" - Duke Dep., p. 31, lines 24-25; p. 32, lines 1-5; See Exhibit "3" - Clements Dep., p. 116, lines 20-25.) Additionally, Kilgore ISD employees receive training and instruction that all forms of discrimination are intolerable.  (See Exhibit "3" - Clements Dep., p. 116, lines 16-19; See Exhibit "6" - Fletcher Dep., p. 16, lines 21-25; p. 17, lines 1-7; See Exhibit "5" - Newell Dep., p. 19, lines 1-16.)

Kilgore ISD regularly provides training to staff regarding the disclosure of confidential information. (See Exhibit "1" - KISD00034-KISD00048; See Exhibit "3" - Clements Dep., p. 15, lines 15-25; See Exhibit "4" - Duke Dep., p. 28, lines 4-9; See Exhibit "6" - Fletcher Dep., p. 17, lines 12-18; See Exhibit "5" - Newell Dep., p. 22, lines 10-17.) Kilgore ISD also regularly provides training to its employees regarding sexual harassment. (See Exhibit "1" - KISD00049-KISD00052.)  It is the duty of campus principals to provide Kilgore ISD employees with this type of training. (See Exhibit "3" - Clements Dep., p. 14, lines 21-25; p. 15, lines 1-2; See Exhibit "4" - Duke Dep., p. 28, lines 4-16.) It is Kilgore ISD's policy not to disclose confidential information. (See Exhibit "1" - KISD01887-KISD01912.) Apart from the claims in the present case, no one has ever alleged that any Kilgore ISD employee wrongfully disclosed any confidential information. (See Exhibit "3" - Clements Dep., p. 117, lines 1-8; See Exhibit "4" - Duke Dep., p. 32, lines 6-9.)  Apart from the claims in the present case, no one has ever alleged that a Kilgore ISD employee wrongfully disclosed any person's sexual orientation. (See Exhibit "3" - Clements Dep., p. 117, lines 5-8.) Kilgore ISD does not have a policy requiring disclosure of a person's sexual orientation. (See Exhibit "2" - George Dep., p. 56, lines 3-6; See Exhibit "3" - Clements Dep., p. 112, lines 16-25; p. 113, lines 1-16.)

S.W. was a student at Kilgore ISD throughout elementary school, middle school, and high school, and was subject to the foregoing policies. (See Exhibit "8" - S.W. Dep., p. 39, lines 24-25; p. 40, lines 1-15.) In her deposition, S.W. testified that she has known she was gay since at least the sixth grade, and that she openly held herself out to be gay as early as February, 2009. (See Exhibit "8" - S.W. Dep., p. 56, lines 3-22.) S.W.'s schoolmates have averred that S.W. has been openly gay for several years, and never attempted to

keep her sexuality secret–even before the events giving rise to this litigation occurred. (See Exhibit "9" - Baggett Aff., p. 1; See Exhibit "10" - Guin Aff.; See Exhibit "11" - Youngblood Aff., p. 1; See Exhibit "12" - Williams Aff., pp. 1-2; See Exhibit "13" - Warren Aff., p. 1; See Exhibit "14" - Meadows Aff., p. 1.)  Additionally, S.W.'s peers describe her as a dishonest person who enjoys negative attention and who was disrespectful to authority figures including Coaches Fletcher and Newell.  (See Exhibit "9" - Baggett Aff., p. 1; See Exhibit "10" - Guin Aff.; See Exhibit "11" - Youngblood Aff., p. 1; See Exhibit "12" - Williams Aff., pp. 1-2; See Exhibit "13" - Warren Aff., p. 1; See Exhibit "14" - Meadows Aff., p. 1.) S.W. described herself to her psychologist using the words "mean," "selfish," "liar," "manipulative," "vindictive," and "self-centered."  (See Exhibit "8" - S.W. Dep., p. 133, lines 14-25; p. 134, lines 1-25; p. 135, lines 1-8.)  In discussing S.W. with her therapist, Barbara Wyatt said that she does not "trust [S.W. as long as I can throw her," that S.W is gay, and that she "lies to the bitter end."  (See Exhibit "7" - B. Wyatt Dep., p. 76, lines 17-22; p. 78, lines 18-21; p. 79, lines 2-24; p. 80, lines 1-25, p. 81, line 1.)

S.W. was a member of the Kilgore High School softball team in the 2008-2009 academic year.  (See Exhibit "1" - KISD02656.)  Although S.W. was athletic, she did not take practices and games seriously and regularly disregarded team rules.  (See Exhibit "9" - Baggett Aff., p. 1; See Exhibit "10" - Guin Aff.; See Exhibit "11" - Youngblood Aff., p. 1; See Exhibit "12" - Williams Aff., pp. 1-2; See Exhibit "13" - Warren Aff., p. 1; See Exhibit "14" - Meadows Aff., p. 1; See Exhibit "8" - S.W. Dep., p. 123, lines 1-25; p. 124, lines 3-14; See Exhibit "6" - Fletcher Dep., p. 82, lines 20-25; p. 83, lines 1-25; p. 84, lines 1-25; p. 85, lines 1-18; See Exhibit "5" - Newell Dep., p. 98, lines 7-25; p. 99, lines 1-12.)  Also, S.W. often exhibited an unsportsmanlike, disruptive attitude which caused her to be difficult to

coach.  (See Exhibit "6" - Fletcher Dep., p. 75, lines 13-25; p. 76, lines 1-8; See Exhibit "5" - Newell Dep., p. 94, lines 18-22; p. 95, lines 1-14; See Exhibit "8" - S.W. Dep., p. 49, lines 18-25; p. 50, lines 1-25, p. 51, lines 1-5.)  As a prerequisite of team membership, S.W. and Barbara Wyatt were required to sign an agreement specifically limiting the persons with whom team players were allowed to ride to practices and games.  (See Exhibit "1" - KISD02656; See Exhibit "6" - Fletcher Dep., p. 82, lines 23-25; p. 83, lines 1-25; p. 84, lines 1-4; See Exhibit "5" - Newell Dep., p. 97, lines 4-12; p. 99, lines 4-10; See Exhibit "8" - S.W. Dep., p. 122, lines 1-25.)  S.W., however, broke this team rule as well by riding to the softball field with an adult who Coaches Fletcher and Newell believed to be a bad influence. (See Exhibit "8" - S.W. Dep., p. 94, lines 13-25; p. 95, lines 1-24; p. 121, lines 9-21; p. 124, lines 6-14.)

On March 3, 2009, a rumor surfaced among the Kilgore High School varsity softball team that S.W. was dating Hillary Nutt, a person she claimed to be Coach Newell's ex-girlfriend.  (See Exhibit "9" - Baggett Aff., p. 2; See Exhibit "11" - Youngblood Aff., p. 1; See Exhibit "12" - Williams Aff., p. 1; See Exhibit "13" - Warren Aff., p. 1; See Exhibit "14" - Meadows Aff., p. 1; See Exhibit "6" - Fletcher Aff., p. 33, line 25; p. 34, lines 1-3; p. 78, lines 4-7; See Exhibit "6" - Newell Dep., p. 72, lines 1-4.)  At the time, S.W. was sixteen years old, and Hillary Nutt was eighteen years old.  (See Exhibit "8" - S.W. Dep., p. 97, lines 3-6.) When Coaches Fletcher and Newell heard that S.W. claimed to be dating Hillary Nutt, they discussed how to handle the situation and determined that they needed to confer with S.W. (See Exhibit "6" - Fletcher Dep., p. 31, lines 3-25; p. 32, lines 1-18.)  Coaches Fletcher and Newell decided that they needed to address any relationship that S.W. had with Hillary Nutt for several reasons.  First, Coach Newell believed that Hillary Nutt was a bad influence on

S.W. because she talked about drinking and smoking marijuana. (See Exhibit "6" - Fletcher Dep., p. 31, lines 6-13; See Exhibit "5" - Newell Dep., p. 103, lines 20-25; p. 104, lines 1-4; See Exhibit "8" - S.W. Dep., p. 125, lines 1-3.)  Also, S.W.'s and Hillary Nutt's ages made any physical relationship between them a potential crime. (See Exhibit "8" - S.W. Dep., p. 97, lines 3-6.)  See TEX. PENAL CODE ANN. § 22.011.  Third, the rumors regarding S.W. and Hillary Nutt were causing dissension on the softball team. (See Exhibit "9" - Baggett Aff., pp. 1-2; See Exhibit "11" - Youngblood Aff., p. 1; See Exhibit "5" - Newell Dep., p. 100, lines 5-25; p. 101, lines 1-14.)  For these reasons, Coaches Fletcher and Newell met with S.W. in the softball locker room after school to discuss the situation. (See Exhibit "6" - Fletcher Dep., p. 35, lines 9-20.)  During that conference, Coach Fletcher asked S.W. about the note she had written which started the rumor about S.W. and Hillary Nutt. (See Exhibit "6" - Fletcher Dep., p. 36, lines 23-25; p. 37, lines 1-23.)  Coaches Fletcher and Newell never asked S.W. if she was gay or a lesbian. (See Exhibit "8" - S.W. Dep., p. 126, lines 8-22.) Rather, they asked S.W. if she was involved with Hillary Nutt, and S.W. confirmed their relationship. (See Exhibit "8" - S.W. Dep., p. 126, lines 23-25; p. 127, lines 1-6.)  At no point did Coaches Fletcher and Newell ever stand over S.W. during the conversation in the locker room. (See Exhibit "8" - S.W. Dep., p. 125, lines 22-25; p. 126, lines 1-4.)  After the conversation in the locker room ended, Coaches Fletcher and Newell released S.W., but asked her to return later.  When Coaches Fletcher and Newell asked S.W. who she was riding with, she lied and told them that she was riding with her grandmother. (See Exhibit "8" - S.W. Dep., p. 125, lines 10-21.)  She was actually riding with Hillary Nutt at the time. (See Exhibit "8" - S.W. Dep., p. 94, lines 13-25; p. 95, lines 1-24; p. 121, lines 9-21; p. 124, lines 6-14.)

After leaving the field, Coaches Fletcher and Newell then called Barbara Wyatt and asked to confer with her about S.W. (See Exhibit "6" - Fletcher Dep., p. 50, lines 1-9; See Exhibit "5" - Newell Dep., p. 55, lines 14-23.) Barbara Wyatt came to the softball field later, and Coaches Fletcher and Newell discussed S.W.'s inappropriate relationship with her. (See Exhibit "5" - Newell Dep., p. 64, lines 5-12.) Coaches Fletcher and Newell never used the words "gay" or "lesbian" during their conversation with Barbara Wyatt. (See Exhibit "7" - B. Wyatt Dep., p. 109, lines 3-8.) Rather, they told Barbara Wyatt that S.W. was involved in an inappropriate relationship. (See Exhibit "6" - Fletcher Dep., p. 52, lines 4-12.) Coaches Fletcher and Newell told Barbara Wyatt the identity of the person with whom S.W. was involved when Barbara Wyatt asked. (See Exhibit "6" - Fletcher Dep., p. 50, lines 14-25; p. 51, lines 1-3; See Exhibit "5" - Newell Dep., p. 65, lines 11-23.) At that point, Barbara Wyatt indicated to Coaches Fletcher and Newell that she had known her daughter was gay before their conversation. (See Exhibit "6" - Fletcher Dep., p. 53, lines 5-12; See Exhibit "5" - Newell Dep., p. 66, lines 1-7.) At the very least, Barbara Wyatt admits that she suspected S.W. was gay before her conversation with Coaches Fletcher and Newell. (See Exhibit "7" - B. Wyatt Dep., p. 52, lines 22-25; p. 53, lines 1-7.) The summary judgment evidence shows that Coaches Fletcher and Newell had this conversation with Barbara Wyatt in order to stop S.W. from spreading rumors and causing dissension on the softball team, and also to inform her that her daughter might have been involved with an adult. (See Exhibit "6" - Fletcher Dep., p. 77, lines 18-25; p. 78, lines 1-3; See Exhibit "5" - Newell Dep., p. 58, lines 13-21.)

Although Barbara Wyatt verbally complained about the incident, she failed to file timely grievances regarding the incident in accordance with Kilgore ISD's policies.

Specifically, Kilgore ISD policy required Plaintiffs to file grievances "within 15 days of the time the student or parent knew, or should have known, of the event or series of events causing the complaint."  (See Exhibit "1" - KISD00361.)  The events giving rise to this litigation occurred on March 3, 2009.  (See Exhibit "3" - Clements Dep., p. 40, line 25; p. 41, lines 1-25; p. 42, lines 1-17.)  Plaintiffs did not file their Level One grievance until August 24, 2009.  (See Exhibit "1" - KISD00180-KISD00181.)

### III.
### STANDARD

Summary judgment is authorized if the movant establishes that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).  Facts are considered "material" if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  A material fact creates a "genuine issue" if the evidence is such that the trier of fact reasonably could resolve the factual dispute in favor of either party.  *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511.  The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  A party moving for summary judgment bears the initial burden of identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  *Id.*

If the party moving for summary judgment meets the initial burden, Rule 56(c)

requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist which creates a genuine issue for trial. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports that party's claim. *Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir. 1994).

Unsupported allegations or affidavit or deposition testimony asserting ultimate or conclusory facts and conclusions of law are not sufficient to defeat a motion for summary judgment. *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (citing *Anderson*, 447 U.S. at 247, 106 S. Ct. at 2509-10). Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little,* 37 F.3d at 1075. "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tenn. Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir. 1998) (quoting *Skotak v. Tenn. Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992)). Unless there is sufficient evidence for a jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial. *Anderson,* 477 U.S. at 249, 106 S. Ct. at 2511.

## IV.
## ARGUMENT AND AUTHORITIES

### I.   The summary judgment evidence shows that Plaintiff's claims against Kilgore ISD are without merit.

"As the Supreme Court has long held, [the Fifth Circuit] require[s] a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom'

that caused the plaintiff's injury." *Goodman v. Harris County, Tex.*, 571 F.3d 388, 396 (5th Cir. 2009) (quoting *Bd. of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 403, 118 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)) (internal quotation marks and brackets omitted).  "[M]unicipal liability attaches where–and only where–a deliberate choice to follow a course of action is made from among various alternatives by city policymakers." *Id.* (quoting *Harris*, 489 U.S. at 389, 109 S. Ct. 1197.)  Therefore, Kilgore ISD may only be liable to Plaintiff if evidence exists that it had a policy, custom, or practice of treating the constitutional rights of citizens with deliberate indifference. *See, e.g., Goodman*, 571 F.3d at 396.  "Deliberate indifference is an extremely high standard to meet." *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).

### *a.   The summary judgment evidence shows that Kilgore ISD does not have a policy, custom, or practice of treating individuals' right to privacy under the 14th Amendment with deliberate indifference.*

As discussed above, Plaintiff alleges that Kilgore ISD "requires that its staff disclose the sexual orientation of their students to parents . . . ." (Pl.'s Compl., ¶ 37, p. 8.)  The summary judgment evidence, however, is completely devoid of any evidence which would support this allegation.  Indeed, the competent summary judgment evidence shows that Kilgore ISD has a policy of keeping confidential information private.

"There is no specific "right to privacy" in the Constitution, but the Supreme Court has recognized "zones of privacy" that impose limits on governmental powers. *Roe v. Wade*, 410 U.S. 113, 152-53, 93 S. Ct. 705, 35 L. Ed. 2d 145 (1973).  The Supreme Court has also recognized the right to "informational privacy." *Whalen v. Roe*, 429 U.S. 589, 598-99, 97 S. Ct. 869, 51 L. Ed. 2d 64 (1977).  There is a constitutional "individual interest in

avoiding disclosure of personal matters." *Id.* at 599, 97 S. Ct. 869.  The Fifth Circuit has not adopted a test to determine if the information disclosed is of such a personal nature as to give rise to a cause of action.  *Zaffuto v. City of Hammond*, 308 F.3d 485, 490 (5th Cir. 2002).  It is clear only that the most intimate details of one's life or the most harmful type of statements can make such a disclosure a violation of one's constitutional rights.  *Id.* However, courts balance one's expectation of privacy against the need for disclosure.  *Nat. Treas. Employees Union v. U.S. Dep't of Treas.*, 25 F.3d 237, 242-43 (5th Cir. 1994) (citing *Woodland v. City of Houston*, 940 F.2d 134, 138 (5th Cir. 1991); *Fraternal Order of Police, Lodge 5 v. City of Phila.*, 812 F.2d 105, 110 (3d Cir. 1987)).  In *Nixon v. Administrator of General Services*, 443 U.S. 425, 458, 97 S. Ct. 2777, 53 L. Ed. 2d 867 (1977), the Court held that "any intrusion [on privacy] must be weighed against the public interest in subjecting the materials . . . to screening," and upheld the disclosure of personal information.  *Id.* at 465, 97 S. Ct. 2777.  The Court summed up the weighing process as follows:

> [T]he constitutionality of the Act must be viewed in the context of the limited intrusion of the screening process, of appellant's status as a public figure, of his lack of any expectation of privacy in the overwhelming majority of the materials, of the important public interest in preservation of the materials, and of the virtual impossibility of segregating the small quantity of private materials without comprehensive screening.

*Id.*

In the present case, the summary judgment evidence shows that Kilgore ISD does not have a policy, custom, or practice of treating individuals' rights to privacy with deliberate indifference.  Plaintiffs can point to no Kilgore ISD policy which specifically requires disclosure of a student's sexual orientation.  Rather, Plaintiffs attempt to argue that a

statement Mr. Clements made in a response to Barbara Wyatt's Level 2 grievance amounted to such a policy.  The summary judgment evidence, however, does not support this argument.  Rather, Mr. Clements' statement that "Coach [sic] Fletcher and Newell are legally obligated to share this information with the parent" related not to S.W.'s sexual orientation, but rather to the fact that she was involved in a relationship which was illegal under the laws of the State of Texas.  (See Exhibit "1" - KISD00062; See Exhibit "3" - Clements Dep., p. 112, lines 16-25; p. 113, lines 1-16); *see* TEX. PENAL CODE ANN. § 22.011 (VERNON 2011) (making any sexual relationship between a person under the age of 17 and over the age of 18 illegal).  The summary judgment evidence also shows that the purpose of Coaches Fletcher's and Newell's conversation with Barbara Wyatt was not to inform her of S.W.'s sexual orientation, but rather to inform her that her sixteen year-old daughter was in a potentially inappropriate and/or illegal relationship with an adult.  (See Exhibit "6" - Fletcher Dep., p. 77, lines 18-25; p. 78, lines 1-3; See Exhibit "5" - Newell Dep., p. 58, lines 13-21.)  Whatever right Plaintiff had to the confidentiality to keep the fact she was dating an adult from her mother was far outweighed by the need to determine whether S.W. was the victim of a crime.  *See Nixon*, 443 U.S. at 458, 97 S. Ct. 2777.

Furthermore, the summary judgment evidence shows that Kilgore ISD does not have a custom or practice of revealing confidential student information.  (See Exhibit "3" - Clements Dep., p. 117, lines 1-8; See Exhibit "4" - Duke Dep., p. 32, lines 6-9.)  Several Kilgore ISD officials testified that there has never been any complaint, allegation, or instance of the disclosure of confidential information in the past.  (See Exhibit "3" - Clements Dep., p. 117, lines 1-8; See Exhibit "4" - Duke Dep., p. 32, lines 6-9.)  The Supreme Court held that "[a] pattern of similar constitutional violations by untrained

employees is 'ordinarily necessary' to demonstrate deliberate indifference. . . ." *Connick v. Thompson*, —U.S.—,131 S. Ct. 1350, 1360, 179L. Ed. 2d 417 (2011).  "Without notice that a course of training is deficient in a particular respect, decision makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* Because the summary judgment evidence shows that Kilgore ISD has not engaged in a pattern or practice of violating any person's constitutional rights, it cannot be held liable for such conduct.

In sum, the uncontroverted summary judgment evidence shows that Kilgore ISD does not have a policy, custom, or practice of treating the rights of students with deliberate indifference.  Therefore, Kilgore ISD respectfully requests that the Court grant its Motion for Summary Judgment.

### *b.  The summary judgment evidence shows that Kilgore ISD does not have a policy, custom, or practice of treating individuals' right to privacy under the Texas Constitution with deliberate indifference.*

Article I, § 9 of the Texas Constitution "is a safeguard to an individual's legitimate expectation of privacy from unreasonable governmental intrusions." *Richardson v. State*, 865 S.W. 2d 944, 948 (Tex. Crim. App. 1993).  Also, under the common law, "an unwarranted invasion of the right of privacy constitutes a legal injury for which a remedy will be granted." *Billings v. Atkinson*, 489 S.W.2d 858, 860 (Tex. 1973).  To establish a claim for invasion of privacy under common law, the complaining party must prove (1) an intentional intrusion, physically or otherwise, upon his solitude, seclusion, or private affairs or concerns, which (2) would be highly offensive to a reasonable person.  *Valenzuela v. Aquino*, 853 S.W.2d 512, 5133 (Tex. 1993).  The Texas Constitution has recognized no

right of action for damages for violation of the state constitution comparable to the right provided by 42 U.S.C. § 1983 for violations of the United States Constitution.  *City of Beaumont v. Bouillion*, 896 S.W.2d 143 (Tex. 1995).  Invasion of privacy is an intentional tort.  *Billings v. Atkinson*, 489 S.W.2d 858, 860-61 (Tex. 1973).

In the present case, Kilgore ISD cannot be held liable for the intentional tort of invasion of privacy because immunity from suit for this intentional tort has not been waived by the Texas Tort Claims Act ("TTCA").  The Texas Tort Claims Act provides a limited waiver of governmental immunity if certain conditions are met.  *Harris County, Tex. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004) (citing TEX. CIV. PRACTICE & REM. CODE ANN. § 101.021 (VERNON 2005).  Sovereign immunity, unless waived, protects the State of Texas from lawsuits for damages absent legislative consent.  *Gen. Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 594 (Tex. 2001).  Sovereign immunity encompasses two principles-immunity from suit and immunity from liability.  *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 405 (Tex. 1997).  "Governmental immunity operates like sovereign immunity to afford similar protection to subdivisions of the State, including counties, cities, and school districts."  *Sykes*, 136 S.W.3d at 638.  A person who sues the State or its subdivisions under state law must establish a waiver of sovereign immunity by 1) demonstrating legislative consent to suit, either by statute or express legislative permission; and 2) pleading facts that fall within the scope of legislative consent.  *See Tex. Dep't of Crim. Justice v. Miller*, 51 S.W.3d 583, 587 (Tex. 2001).  The TTCA does not waive the State's sovereign immunity for the intentional tort of invasion of privacy.  *See Tex. State Tech. Coll. v. Wehba*, No. 11-05-00287-CV, 2006 WL 572022, at *2 (Tex. App.–Eastland March 9, 2006, no pet.) (citing TEX. CIV. PRACTICE & REM. CODE ANN. § 101.057(2)) (holding that a

claim of invasion of privacy against a state technical college was barred by sovereign immunity); *Univ. of Tex. Med. Branch at Galveston v. Hohman*, 6 S.W.3d 767, 777 (Tex. App.–Houston [1st Dist.] 1999, pet. dism'd w.o.j.) (state agency was immune from claim of invasion of privacy).

In the present case, Plaintiffs cannot maintain their privacy claims against Kilgore ISD because privacy claims constitute an intentional tort for which the TTCA does not waive sovereign immunity.  Therefore, Plaintiff's claims against Kilgore ISD for invasion of privacy must fail.  Because Plaintiff's state law claims against Kilgore ISD are barred by sovereign immunity, summary judgment is appropriate.  Therefore, Kilgore ISD respectfully requests that the Court grant its Motion for Summary Judgment.

### II.   The summary judgment evidence shows that Plaintiff's claims against Coaches Fletcher, Newell, and Duke are without merit.

#### a. The summary judgment evidence shows that Plaintiff's Fourteenth Amendment claims against Coaches Fletcher and Newell are meritless.

"A student's privacy interest is limited in a public school environment where the State is responsible for maintaining discipline, health, and safety . . . .  Securing order in the school environment sometimes requires that students be subjected to greater controls than those appropriate for adults."  *Bd. of Ed. v. Earls*, 536 U.S. 822, 830-31, 122 S. Ct. 2559, 153 L. Ed. 2d 735 (2002).  Although the Fifth Circuit has never specifically determined what types of disclosures are of such a personal nature that they constitute a constitutional violation, it is clear that courts must balance one's expectation of privacy against the need for disclosure.  *Nat. Treas. Employees Union*, 25 F.3d at 242-43; *Nixon*, 443 U.S. at 458; *see, e.g., Zuffuto v. City of Hammond, La.*, 308 F.3d 485, 490 (5th Cir. 2002).  ". . . [W]hen

the privacy right is invoked to protect confidentiality, there is no violation if a legitimate state interest outweighs the plaintiff's privacy interest." *Cinel v. Connick*, 15 F.3d 1338, 1342 (5th Cir. 1994) (citing *Fadjo v. Coon*, 633 F.2d 1172, 1176 (5th Cir. 1981)).

In the present case, the summary judgment evidence shows that neither Coach Fletcher nor Coach Newell specifically revealed S.W.'s sexuality to Barbara Wyatt or anyone else.  During their conversation with Barbara Wyatt, neither Coach Fletcher nor Coach Newell ever referred to S.W.'s sexuality or used the word "gay," "lesbian," or any other such word to refer to S.W.  (See Exhibit "7" - B. Wyatt Dep., p. 109, lines 3-8.)  Rather, Coach Fletcher informed Barbara Wyatt that her daughter might possibly be involved in an inappropriate relationship with an adult.  (See Exhibit "6" - Fletcher Dep., p. 77, lines 18-25; p. 78, lines 1-3; See Exhibit "5" - Newell Dep., p. 58, lines 13-21.)   As discussed more fully, *supra*, any sexual relationship with the 16 year-old S.W. and an adult would have violated Texas' statutory rape laws.  Coaches Fletcher and Newell then provided Barbara Wyatt with the identity of this adult after she asked for it.  (See Exhibit "6" - Fletcher Dep., p. 50, lines 14-25; p. 51, lines 1-3; See Exhibit "5" - Newell Dep., p. 65, lines 11-23.)  At no time did Coaches Newell or Fletcher reveal S.W.'s sexual orientation to Barbara Wyatt or anyone else.

Clearly, the summary judgment evidence shows that neither Coach Fletcher nor Coach Newell revealed S.W.'s sexual orientation to any person.  Even so, their revelation to Barbara Wyatt that S.W. might be involved in an inappropriate relationship did not violate S.W.'s privacy.  As mentioned above, Coaches Fletcher and Newell were charged with the responsibility of "maintaining discipline, health, and safety" of students. *Earls*, 536 U.S. at 830, 122 S. Ct. 2559.  Coaches Fletcher and Newell had heard that S.W. might have been

involved in an inappropriate relationship with an adult and determined that S.W.'s safety might be better protected if Barbara Wyatt were made aware of the situation so that she could address any safety concerns that she may have had for her daughter.  (See Exhibit "6" - Fletcher Dep., p. 77, lines 18-25; p. 78, lines 1-3; See Exhibit "5" - Newell Dep., p. 58, lines 13-21.)  As stated above, the summary judgment evidence shows that the purpose of this conversation was not to reveal S.W.'s sexuality.  It cannot be reasonably argued that S.W.'s safety did not outweigh any privacy interests she may have had in keeping her possible illegal relationship with an adult a secret from her mother.  As a student, S.W.'s privacy interests were limited in light of the fact that Kilgore ISD and its employees were charged with keeping her safe while she was in their custody, care, and control.  *See Earls*, 536 U.S. at 830, 122 S. Ct. 2559.  In short, Coaches Fletcher and Newell determined that S.W.–a 16 year-old child–might have been involved in an inappropriate relationship with an adult.  They then alerted Barbara Wyatt of the fact that her daughter might have been the victim of a crime.  Whatever S.W.'s expectation of privacy was in keeping her possible illegal relationship a secret from her mother, it did not outweigh Coaches Fletcher's and Newell's interest in trying to protect S.W. from becoming the victim of a crime.  Therefore, Coaches Fletcher and Newell respectfully request that the Court grant their Motion for Summary Judgment.

### b.  The summary judgment evidence shows that Plaintiff's state law privacy claims against the individual Defendants are meritless.

As mentioned, *supra*, a claim for invasion of privacy under Texas common law requires (1) an intentional intrusion, physically or otherwise, upon his solitude, seclusion, or private affairs or concerns, which (2) would be highly offensive to a reasonable person.

*Valenzuela v. Aquino*, 853 S.W.2d 512, 5133 (Tex. 1993).  In the present case, Plaintiffs are unable to present any summary judgment evidence to support the first element of their claim for invasion of privacy.  First, Plaintiffs can produce absolutely no summary judgment evidence which would show that Coach Duke ever invaded S.W.'s privacy or discussed her sexual orientation at any time.  (See Exhibit "4" - Duke Dep., p. 31, lines 3-6.)  Therefore, summary judgment is proper for Coach Duke as to this claim.   Next, Plaintiff's claims against Coaches Fletcher and Newell must fail because there is no evidence that they made an intentional intrusion on S.W.'s private affairs or concerns.  Rather, the summary judgment evidence shows that S.W. had told several people that she was in some sort of relationship with an adult.  (See Exhibit "9" - Baggett Aff., p. 1; See Exhibit "10" - Guin Aff.; See Exhibit "11" - Youngblood Aff., p. 1; See Exhibit "12" - Williams Aff., pp. 1-2; See Exhibit "13" - Warren Aff., p. 1; See Exhibit "14" - Meadows Aff., p. 1.)  To the extent that Coaches Fletcher and Newell attempted to protect S.W. from being the victim of a possible crime by discussing the inappropriate relationship with Barbara Wyatt, they did not "intentionally intrude" upon S.W.'s private affairs or concerns for the purposes of the tort of invasion of privacy.  Rather, they were protecting her welfare.  Additionally, S.W. had publically broadcast both her sexuality and her relationship with the adult, thereby causing these matters to no longer be "private affairs or concerns" for the purposes of the tort of invasion of privacy.  Therefore, Coaches Duke, Fletcher, and Newell respectfully request that the Court grant their Motion for Summary Judgment.

### *c. The summary judgment evidence shows that Plaintiff's Fourth Amendment right to be free from unreasonable seizures was not treated with deliberate indifference.*

The Fourth Amendment protects the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  *Terry v. Ohio*, 392 U.S. 1, 99 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).  "The central inquiry under the Fourth Amendment is whether a search or seizure is reasonable under all the circumstances of a particular governmental invasion of a person's personal security.  To assess the reasonableness of a . . . seizure, courts balance the governmental interest against the invasion which the search or seizure entails." *Milligan v. City of Slidell, La.*, 226 F.3d 652, 654 (5th Cir. 2000) (citing *Terry*, 392 U.S. at 19, 20-21, 88 S. Ct. 1868) (internal citations omitted).  Therefore, the court must consider the "context in which a Fourth Amendment right is asserted."  *Id.*  "[A] full bore *Terry* analysis is inappropriate" in cases involving the rights of students in a public school.  *Id.*  "Although the Fourth Amendment applies in schools, the nature of those rights is what is appropriate for children in school." *Id.* at 655 (citing *Veronia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655-56 115 S. Ct. 2386, 132 L. Ed. 2d 564 (1995)).  The court's reasonableness inquiry "must take into account the school's custodial and tutelary responsibilities for children."  *Id.* (quoting *Acton*, 515 U.S. at 656, 115 S. Ct. 2386) (internal quotation marks omitted).  "[S]tudents in a school environment have a lesser expectation of privacy than members of the population generally."  *Id.* (quoting *Acton*, 515 U.S. at 657, 115 S. Ct. 2386) (internal quotation marks omitted).  The Fifth Circuit has openly doubted that students have a right not to be summoned to a school official's office and questioned on disciplinary matters.  *Id.*  Any such right "hardly squares with the schools' obligation to inculcate the habits and manners of

civility" within students.  *Id.* (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 681, 106 S. Ct. 3195, 3163, 92 L. Ed. 2d 549 (1986)).

The Fifth Circuit's analysis in *Milligan*, *supra*, is instructive on this issue.  In *Milligan*, an assistant high school principal heard rumors that several students were planning to have a fight.  *Id.* at 653.  The assistant principal called one of the students into her office to question him about the fight and warn them not to engage in any such behavior.  *Id.*  The plaintiff alleged that during that meeting, he felt physically intimidated and did not feel free to leave the assistant principal's office.  *Id.* at 653-54.  The plaintiff later sued the school for violating his Fourth Amendment right to be free from unreasonable seizures.  The Fifth Circuit found that any right the plaintiff had to be free from the interrogation in the assistant principal's office did not outweigh the school's interest in preventing the fight.  *Id.* at 655. The Court noted that students in a school environment have a lesser expectation of privacy than the general population.  *Id.* at 655-56.  "Teachers . . . control their movements from the moment they arrive at school; for example, students cannot simply walk out of a classroom . . . [or ] walk out of a principal's . . . office in the middle of any official conference.  Students at school thus have a significantly lesser expectation of privacy in regard to the temporary "seizure" of their persons than does the general population."  *Id.*

In the present case, it is clear that S.W.'s Fourth Amendment rights were not treated with deliberate indifference as a result of the meeting she had in the locker room with Coaches Fletcher and Newell.  To the extent that S.W. had a right to be free from being called into the locker room to conference with the coaches to be questioned about a matter involving her safety or discipline, such right is far outweighed by the educators' interest in protecting S.W.'s safety and maintaining discipline on the softball team.  As mentioned

above, Coaches Fletcher and Newell had heard that 16 year-old S.W. might have been involved in a romantic relationship with an adult.  Additionally, S.W.'s spreading of rumors had significantly impacted the team's morale.  As in *Milligan*, Coaches Fletcher and Newell had a significant interest in promoting discipline and in preventing S.W. from becoming the possible victim of a crime.  Furthermore, S.W.'s right to be free from a temporary "seizure" of her person was significantly diminished in the school setting.  Coach Fletcher's and Coach Newell's interest in S.W.'s safety and maintaining the discipline of the softball team outweighed S.W.'s right–if any–not to be called into the locker room for a conference.  Therefore, Plaintiffs' claims against them pursuant to the Fourth Amendment must fail.

### *d.  The summary judgment evidence shows that Plaintiff's claims against Coach Duke and Kilgore ISD for failure to train are meritless.*

The failure to provide proper training may fairly be said to represent a policy for which the [municipality] is responsible, and for which the [municipality] may be held liable if it actually causes injury."  *Brown v. Bryan County, Okla.*, 219 F.3d 450, 457 (5th Cir. 2000) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)).  "In resolving the issue of a [municipality's] liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform."  *City of Canton*, 489 U.S. at 390, 109 S. Ct. 1197.  A plaintiff must show that (1) the municipality's training policy or procedure was inadequate; (2) the inadequate training policy was a "moving force" in causing violation of the plaintiff's rights; and (3) the municipality was deliberately indifferent in adopting its training policy.  *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010); *Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996).  It will not "suffice to prove that an injury or accident could have been avoided if an officer had . . .

better or more training, sufficient to equip him to avoid the particular injury-causing conduct [since] . . . [s]uch a claim could be made about almost any encounter resulting in injury." *City of Canton*, 489 U.S. at 391, 109 S. Ct. 1197.  "All that is required for the municipality to prevail in a claim based on inadequate training is compliance with the state-mandated training standard for its officers."  *Huong v. City of Port Arthur*, 961 F. Supp. 1003, 1007 (E.D. Tex. 1997) (citing *Brown*, 53 F.3d at 1424-25).

In the present case, the summary judgment evidence shows that Coach Duke was not responsible for providing training to Kilgore ISD staff regarding confidentiality or harassment.  (See Exhibit "4" - Duke Dep., p. 28, lines 4-16.)  Rather, this was the duty of Kilgore ISD's principals.  (See Exhibit "3" - Clements Dep., p. 14, lines 21-25; p. 15, lines 1-2; See Exhibit "4" - Duke Dep., p. 28, lines 4-16.)  Because it was not Coach Duke's duty to train Coaches Fletcher and Newell regarding confidentiality, he cannot be held liable for any alleged deficiency in their training.  Holding Coach Duke liable in this instance would essentially amount to finding that Coach Duke is liable under a theory of *respondeat superior*.  As the Court well knows, "government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft v. Iqbal*, ___U.S.___, 129 S. Ct. 1937, 1948, 173 L. Ed. 2d 868 (2009).  Therefore, Plaintiff's claims against Coach Duke for failure to train must fail.

Additionally, Plaintiff's claims against Kilgore ISD for failure to train must also fail. In order to prevail on a claim of inadequate training, Plaintiffs must show: (1) the municipality's training policy or procedure was inadequate; (2) the inadequate training policy was a "moving force" in causing violation of the plaintiff's rights; and (3) the municipality was deliberately indifferent in adopting its training policy.  *Sanders-Burns v.*

*City of Plano*, 594 F.3d 366, 381 (5ᵗʰ Cir. 2010).  Here, Plaintiffs cannot meet the first element of their claim because the summary judgment evidence clearly shows that Kilgore ISD's training policy was adequate.  Specifically, Kilgore ISD provided extensive training to its employees on confidentiality issues.  (See Exhibit "1" - KISD00034-KISD00048; See Exhibit "3" - Clements Dep., p. 15, lines 15-25; See Exhibit "4" - Duke Dep., p. 28, lines 4-9; See Exhibit "6" - Fletcher Dep., p. 16, lines 10-23; p. 17, lines 12-18; See Exhibit "5" - Newell Dep., p. 19, lines 1-16; p. 20, lines 4-24; p. 22, lines 10-23.)  Additionally, Plaintiffs cannot meet the second element of their claim because there is no summary judgment evidence which would show that inadequate training was the moving force behind a constitutional wrong.  Finally, Plaintiffs cannot meet the third element of their claim because there is no evidence which would show that Kilgore ISD was deliberately indifferent in adopting its training policies.  Finally, to be a certified teacher, as all the individual Defendants are, they have to have all state mandated training.  Therefore, Defendants respectfully request that the Court grant their Motion for Summary Judgment.  ***e.  Mere words are insufficient to constitute a § 1983 violation.***

"Mere words or idle threats" are not sufficient to state a cause of action under 42 U.S.C. § 1983.  *Lamar v. Steele*, 698, F.2d 1286 (5ᵗʰ Cir.), *cert. denied*, 464 U.S. 821, 104 S. Ct. 86, 78 L. Ed. 2d 95 (1983).  "Mere threatening language and gestures of a custodial office do not, even if true, amount to constitutional violations."  *McFadden v. Lucas*, 713 F.2d 143, 146 (5ᵗʰ Cir. 1983).

The present lawsuit, by definition, is based on Plaintiffs' allegation that they were injured by mere words.  Therefore, even if Coaches Fletcher and Newell revealed S.W.'s sexual orientation–which the summary judgment evidence shows that they did not–their

mere words are insufficient to state a violation pursuant to § 1983.  *Id.*

### III.  The individual Defendants are entitled to qualified immunity even if Plaintiffs' constitutional rights were violated.

As demonstrated above, the summary judgment evidence clearly shows that Plaintiffs' constitutional rights were not violated as a result of any of the actions of any Defendant.  Even if Plaintiffs were able to show that S.W.'s constitutional rights were violated, however, the individual Defendants would be entitled to qualified immunity.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982).  Qualified immunity protects all except those that are incompetent or who knowingly violate the law.  *See Anderson v. Creighton*, 483 U.S. 635, 639, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987).

The well-established test for qualified immunity requires a two-step inquiry.  First, the court must determine whether a public official's conduct deprived a plaintiff of a "clearly established" constitutional or statutory right.  *See Harlow*, 457 U.S. at 818, 102 S. Ct. at 2738; *Sanchez v. Swyden*, 139 F.3d 464, 466 (5th Cir. 1998); *Salas v. Carpenter*, 980 F.2d 299, 304 (5th Cir. 1992).  The constitutional right must be sufficiently clear to put a reasonable officer on notice that certain conduct violates that right.  *See Anderson*, 483 U.S. at 639, 107 S. Ct. at 3039; *Sanchez*, 139 F.3d at 466; *Melear v. Spears*, 862 F.2d 1177, 1187 (5th Cir. 1989).  The Supreme Court has warned against vague or general assertions of constitutional rights and has required a plaintiff to state with specificity the

constitutional right that has been allegedly violated – otherwise, liability could be imposed in every case.  *See Anderson*, 483 U.S. at 639, 107 S. Ct. at 3039.  "A constitutional violation does not occur every time someone feels that they have been wronged or treated unfairly." *Sanchez*, 139 F.3d at 466-67 (citing *Shinn v. College Station Indep. Sch. Dist.*, 96 F.3d 783, 786 (5th Cir. 1996)).  Not every alleged tort or wrong by a Plaintiff constitutes a violation of a civil right.  *Albright v. Oliver*, 510 U.S. 226, 269-71 (1994).  Section 1983 does not grant a cause of action to the Plaintiff for every action taken by a state official. *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

Even if an official violated a plaintiff's civil rights, that official may assert the defense of qualified immunity if his conduct was objectively reasonable.  *Sanchez*, 139 F.3d at 467 (citing *Mouille v. City of Live Oak*, 918 F.2d 548, 551 (5th Cir. 1990); *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir. 1990)).  In other words, the official is entitled to qualified immunity if a reasonable person in the official's position would have done the same thing.  Whether an official's conduct is objectively reasonable depends upon the circumstances confronting the official as well as "clearly established law" in effect at the time of the official's actions.  *Anderson*, 483 U.S. at 641, 107 S. Ct. at 3040; *Sanchez*, 139 F.3d at 467.  The official's knowledge of the relevant law need not rise to the level of a "constitutional scholar." *Sanchez*, 139 F.3d at 467 (citing *Harlow*, 457 U.S. at 815-17, 102 S. Ct. at 2736-38).  An official's conduct is objectively reasonable unless "all reasonable officials would have realized the particular challenged conduct violated the constitutional provisions sued on."  *Wooley v. City of Baton Rouge*, 211 F.3d 913, 918-19 (5th Cir. 2000). Also, "the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. 107 S. Ct. at 3039.  It must

be apparent that the official's action is unlawful.  *Id.*

"This two-part test sits atop a firm policy foundation.  Foremost among these policy considerations is the deterrent effect that civil liability may have on the willingness of public officials to fully discharge their professional duties."  *Sanchez*, 139 F.3d at 467-68 (citing *Pierson v. Ray*, 386 U.S. 547, 555, 87 S. Ct. 1213, 1218, 18 L. Ed. 2d 288 (1967); *Anderson*, 483 U.S. at 638, 107 S. Ct. at 3038; *Harlow*, 457 U.S. at 814, 102 S. Ct. at 2736; *Scheuer v. Rhodes*, 416 U.S. 232, 239-41, 94 S. Ct. 1683, 1688, 40 L. Ed. 2d 90  (1974)). "Expansive civil liability for actions taken while on duty may cause [governmental officials] to hesitate before acting–a situation that could produce unwelcome results."  *Sanchez*, 139 F.3d at 468 (citing *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986)).

When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense.  *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002).  Thus, the burden is on Plaintiff to overcome the Defendants' defense of qualified immunity.  *See Burns-Toole v. Byrne*, 11 F.3d 1270, 1274 (5th Cir. 1994).  To do so, Plaintiff must show that Defendants' conduct was not objectively reasonable and, further, that they violated clearly established law.  *Burns-Toole*, 11 F.3d at 1274 (citing Harlow, 457 U.S. at 818-19, 102 S. Ct. at 2738-39).  Whether an official's conduct was objectively reasonable is a question of law for the court, not a matter for the jury.  *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999).

### *a.  Coach Duke is entitled to qualified immunity from Plaintiffs' claims.*

In the present case, the summary judgment evidence clearly shows that none of Plaintiffs' constitutional rights were violated as a result of any of Coach Duke's actions. Even if Plaintiff were able to show a constitutional injury, however, the summary judgment evidence shows that Coach Duke is entitled to qualified immunity because no reasonable person in Coach Duke's position would have believed that his limited actions with respect to this litigation would have violated S.W.'s constitutional rights.  Plaintiffs are suing Coach Duke for failure to train Coaches Fletcher and Newell, and "[b]ecause he is the supervisor of the coaches."  (See Exhibit "8" - S.W. Dep., p. 112, lines 3-16; See Exhibit "7" - B. Wyatt Dep., p. 94, lines 12-17.)  The summary judgment evidence shows, however, that it is not Coach Duke's responsibility to conduct such training.  (See Exhibit "3" - Clements Dep., p. 14, lines 21-25; p. 15, lines 1-2; See Exhibit "4" - Duke Dep., p. 28, lines 4-16.) Additionally, Coach Duke was sued for the state-law intentional tort of invasion of privacy. There is absolutely no summary judgment evidence which would show that Coach Duke ever invaded S.W.'s privacy.  According to the summary judgment evidence, Coach Duke's only involvement in the events giving rise to this litigation was hearing Barbara Wyatt's complaints against Coaches Fletcher and Newell.  (See Exhibit "4" - Duke Dep., p. 13, lines 15-25; p. 14, lines 1-12; p. 15, lines 1-25; p. 16, lines 1-20; p. 20, lines 23-25; p. 21, lines 1-14.)

The summary judgment evidence shows that any reasonable educator in Coach Duke's position would have believed that he or she would not be treating a student's constitutional rights with deliberate indifference by meeting with a parent and hearing her complaints.  Indeed, a contrary argument is simply unreasonable.  Clearly, other

reasonable teachers in Coach Duke's position would believe that they could hear a parent's complaint about a teacher without violating the student's constitutional rights.  There is no summary judgment evidence which would show that Coach Duke knew of, but was deliberately indifferent to, a known risk that he would violate S.W.'s constitutional rights. Therefore, Coach Duke respectfully requests that the Court grant his Motion for Summary Judgment on the issue of qualified immunity.

### b.  Coaches Fletcher and Newell are entitled to qualified immunity from Plaintiff's claims.

As discussed above, the summary judgment evidence in the present case shows that none of S.W.'s constitutional rights were violated as a result of Coach Fletcher's and Coach Newell's actions.  Even if her constitutional rights were violated, however, there is no summary judgment evidence which would show that Coaches Fletcher and Newell knew of, but was deliberately indifferent to, a known risk that they would violate S.W.'s constitutional rights.  Additionally, the summary judgment evidence shows that not all educators in Coaches Fletcher's and Newell's positions would have believed that their actions would have violated a student's constitutional rights.  This is most apparent when reviewing Coaches Fletcher's and Newell's actions in light of the affidavit of Dr. Mike Moses.  Dr. Moses has served as a teacher and administrator in four Texas school districts, and has also served as the State Commissioner of Education for almost five years.  (See Exhibit "15" - Moses Aff., p. 1.)  Dr. Moses reviewed Plaintiff's allegations and the actions of Coaches Fletcher and Newell.  (See Exhibit "15" - Moses Aff., pp. 1-2.)  In Dr. Moses' opinion, Coaches Fletcher's and Newell's actions were reasonable and did not violate any constitutional standards.  (*See generally* Exhibit "9" -  Moses Aff., pp. 3-12.)  Additionally,

the actions of Coaches Fletcher and Newell were reviewed and found to be reasonable by Board President Terry George, a former coach and teacher.  (See Exhibit "2" - George Dep., p. 10, lines 3-24; p. 17, lines 7-11.)  By definition, Dr. Moses' and Mr. George's opinions entitle Coaches Fletcher and Newell to qualified immunity because not "all reasonable officials would have realized the particular challenged conduct violated the constitutional provisions sued on." *Wooley*, 211 F.3d at 918-19.  Clearly, Coaches Fletcher and Newell are entitled to qualified immunity because reasonable teachers would not believe that conducting a disciplinary meeting with a student would violate that student's constitutional rights.  Additionally, reasonable teachers would not believe that  informing the student's parent that her child was potentially the victim of a crime somehow violated the student's constitutional rights.  In short, Coaches Fletcher and Newell are entitled to summary judgment on the issue of qualified immunity.

### *IV.  Plaintiffs are not entitled to a declaratory judgment or injunctive relief.*

Plaintiffs also seek a declaratory judgment that Kilgore ISD and the coaches violated her constitutional rights, and to enjoin them from "disclosing private information about S.W." (Pl.'s Compl., p. 10, ¶ 10.)  The purpose of a declaratory judgment is to establish the parties' rights, status, or legal relationships.  *See, e.g., Brister v. Faulkner*, 214 F.3d 675 (5th Cir. 2000).  Declaratory judgments provide remedies to parties who desire early adjudications of matters without having to wait for adversaries to file suit.  *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 286, 115 S. Ct. 2137, 132 L. Ed. 2d 214 (1995). Declaratory judgments are not an independent cause of action, but rather a form of relief. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240, 57 S. Ct. 461, 81 L. Ed. 617 (1937).

Plaintiff is not entitled to a declaratory judgment in the present case because it is clear that her constitutional rights have not been violated.  Plaintiff's rights and legal status are well-established and need not be determined by this Court to any further extent.

Additionally, Plaintiff seeks an injunction.  Injunctive relief is authorized by general principles of equity.  *eBay Inc. v. Merc-Exchange, L.L.C.*, 547 U.S. 388, 391, 126 S. Ct. 1735, 164 L. Ed. 2d 480 (2006).  In order to obtain permanent injunctive relief, a plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.  *Id.*  "[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and . . . such discretion must be exercised consistent with traditional principles of equity . . . ."  *Id.* at 394, 126 S. Ct. 1735; *see also Shirley v. Sheriff, Henderson Cty. Jail*, No. 6:10cv331, 2010 WL 3239426, at *1 (E.D. Tex. July 12, 2010).

In the present case, Plaintiff simply cannot produce evidence sufficient to show that she is entitled to injunctive relief.  Additionally, Plaintiff has not pleaded any facts which would show that she is entitled to injunctive relief.  There is no evidence in the record which would support any of the elements which Plaintiff must prove to be entitled to injunctive relief.  Specifically, Plaintiff has not–and cannot–produce any evidence of an irreparable injury for which remedies at law are inadequate to compensate.  Furthermore, Plaintiff cannot show that the injury she faces as a result of the conduct she wishes to enjoin outweighs the burden such an injunction would place on Defendants' First Amendment

rights.  *See Winter v. Natural Resources Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 376, 172 L. Ed. 2d 249 (2008); *Cty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 487 (6th Cir. 2002) (holding that the plaintiff did not demonstrate that the potential injury which might have resulted from the release of guards' names outweighed reporters' First Amendment rights).   Indeed, Plaintiff would have a particularly difficult time proving that element in light of the fact that she had publically broadcast her sexual orientation on television.   Specifically, S.W. and her mother both granted interviews to a local television news station–using their likenesses and full legal names–in which both openly discussed S.W.'s sexual orientation.  *See* http://abcnews.go.com/GMA/video/gay-teen-sues-school-over-being-outed-12473990 (last visited on August 29, 2011).   That news segment is available without restriction to all internet users around the world.  *Id.*  In light of the fact that Plaintiffs have publically broadcast S.W.'s sexual orientation, it can hardly be argued that Defendants' First Amendment rights should be encumbered merely to preserve a polite fiction.   Additionally, public policy does not weigh in favor of such an injunction in light of Plaintiffs' public broadcast of S.W.'s sexual orientation.   Therefore, Kilgore ISD and the coaches respectfully request that the Court deny Plaintiff's request for injunctive relief in light of the fact that they have not pleaded any facts entitling them to such relief and that there is no evidence which would support such relief.

### *V.  Plaintiffs failed to exhaust administrative remedies.*

The Texas Education Code states that "[a] person may not file suit against a professional employee of a school district unless the person has exhausted the remedies provided by the school district for resolving the complaint."   TEX. EDUC. CODE ANN. § 22.0514 (VERNON 2006).   In the present case, Plaintiffs failed to exhaust their

administrative remedies before filing suit.  As mentioned above, Kilgore ISD policy required Plaintiffs to file Level One grievances within 15 days of the event of which they complain. (See Exhibit "1" - KISD00361.)  While the events giving rise to this litigation occurred on March 3, 2009, Plaintiffs did not file their Level One grievance until August 24, 2009.  (See Exhibit "3" - Clements Dep., p. 40, line 25; p. 41, lines 1-25; p. 42, lines 1-17; See Exhibit "1" - KISD00180-KISD00181.)  Barbara Wyatt testified that she had received and reviewed student handbooks which described the grievance procedures before the events giving rise to this litigation occurred.  (See Exhibit "7" - B. Wyatt Dep., p. 35, lines 3-5; p. 36, lines 1-7.) Therefore, Plaintiffs' claims are barred for failure to exhaust administrative remedies.

## V.
## CONCLUSION

The summary judgment evidence clearly shows that none of Plaintiffs' constitutional rights were violated as a result of the events giving rise to this litigation.  WHEREFORE, PREMISES CONSIDERED, Defendants respectfully requests that the Court grant its Motion for Summary Judgment.

Respectfully submitted,

**FLOWERS DAVIS, P.L.L.C.**
1021 ESE Loop 323, Suite 200
Tyler, Texas 75701
(903) 534-8063
(903) 534-1650 Facsimile

_____

**DAVID IGLESIAS**
State Bar No. 24051733
drhi@tyler.net

**ROBERT S. DAVIS**
State Bar No. 05544200
rsd@tyler.net
Lead Attorney

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing instrument was served upon all counsel of record in the above entitled and numbered cause on September 1, 2011, in the following manner:

   X    Via ECF

_____

**David Iglesias**