UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| BARBARA WYATT, as next friend of | § | |
| her minor daughter, S.W. | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. 6:10-cv-674 |
| | § | |
| KILGORE INDEPENDENT SCHOOL DISTRICT, | § | |
| and RHONDA FLETCHER,  DOUGLAS DUKE, | § | |
| CASSANDRA NEWELL, in their personal | § | |
| capacities, | § | |
| Defendants. | § | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND OBJECTION TO EVIDENCE**

I.  SUMMARY JUDGMENT EVIDENCE

The following is offered in support of this Response to Defendant's Motion of Summary

Judgment:

Exhibit A        Deposition testimony of Barbara Wyatt

Exhibit B        Deposition testimony of S.W.

Exhibit C        Declaration of S.W.

Exhibit D        Declaration of Barbara Wyatt

Exhibit E        Deposition testimony of Cassandra Newell

Exhibit F        Declaration of Stephen Thorne, Ph.D.

Exhibit G        Deposition testimony of Terry George

Exhibit H        Deposition testimony of Jody Clements

Exhibit I        KISD's Response to Requests for Admission

Exhibit J        KISD Employee Handbook 2008-2009

Exhibit K        Rhonda Fletcher's Responses to Interrogatories

Exhibit L          Cassandra Newell's Responses to Interrogatories

Exhibit M          Declaration of Kristine Vowels, Ed.D.

Exhibit N          Declaration of Hillary Nutt

Exhibit O          KISD's Responses to Interrogatories

Exhibit P          KISD Decision on Level Two Hearing

## II. STATEMENT OF FACTS

S.W. attended schools in Kilgore ISD for twelve years and participated in school athletics from eighth grade on, including two years playing varsity softball at Kilgore High School. (Exhibit B, S.W. Dep. 41:19-20). S.W. was an enthusiastic and well-liked player on her softball team, and led a normal teenage life. But, on March 3, 2009, Defendants Rhonda Fletcher and Cassandra Newell violated her privacy and personal autonomy in the worst possible way. Maliciously and without justification or consent, they disclosed S.W.'s sexual orientation to her mother, Barbara Wyatt (Exhibit A, Barbara Wyatt Dep. 111:6-9). Their unconstitutional and unethical action caused S.W. severe mental and emotional anguish, resulted in social isolation, and robbed her of the freedom to deal with her sexuality privately, at her own pace and on her own terms (Exhibit C, S.W. Decl., paragraphs 20-24).

On the afternoon of March 3, 2009, S.W. learned of an unscheduled softball team meeting through an announcement at the end of her classes. As she arrived at the playing field, which was off the school campus, Defendants Fletcher and Newell dismissed the rest of the team. (Exhibit C, S.W. Decl., paragraph 3).

Fletcher and Newell then led her into the empty locker room, locked the door behind them, and began interrogating her. (Exhibit B, S.W. Dep. 119:23-25). Fletcher demanded to know whether S.W. was dating a girl named Hillary Nutt. (Exhibit C, S.W. Decl., paragraph 6).

2

S.W. did not want to answer this question, but after Fletcher interrogated her several times, yelled, and intimated her, she eventually said yes. (Exhibit C, S.W. Decl. paragraph 11).  Fletcher also accused S.W. of spreading gossip about this other girl being "Coach Newell's ex-girlfriend." (Exhibit B, S.W. Dep. 120:15-21), which she had not done. (Exhibit C, S.W. Decl., paragraph 7).

Ms. Nutt had interacted with Defendant Newell at a number of school events (Exhibit E, Newell Dep. 46:1-6). At the time of Fletcher and Newell's confrontation, S.W. and Ms. Nutt had arranged a date, but were not in a relationship (Exhibit B, S.W. Dep. 121:5-6). When S.W. denied their accusations, Fletcher and Newell reacted angrily. Fletcher advanced in close to S.W. and began yelling at her, threatening to sue her for slander and calling her a "liar." (Exhibit C, S.W. Decl., paragraph 9). S.W. was very afraid, and feared they might strike her. (*Id.*, paragraph 10). Defendants continued to intimidate their player alone in the locker room.

Fletcher and Newell then threatened S.W. that they were going to tell her mother that she was gay and having a sexual relationship with another girl (*Id.*, paragraph 12). They made it clear to S.W. that she could not play in the softball game that night until they told her mother this information (*Id.*, paragraph 14). Finally, they allowed S.W. to leave the locker room when someone knocked on the door from the outside. (*Id.*, paragraph 15).

Next, Fletcher called S.W.'s mother, Ms. Wyatt, and told her to meet Newell and herself at the field, which she did approximately forty minutes later (Exhibit D, Barbara Wyatt Decl., paragraphs 3-4). In an accusatory tone, Fletcher asked if Ms. Wyatt knew where her daughter was. She recited her confrontation with S.W. in the locker room earlier that day. Then, Fletcher revealed S.W.'s sexual orientation to her mother by telling Ms. Wyatt that S.W. was dating a girl whom Fletcher described as S.W.'s "girlfriend." (Exhibit A, Wyatt Dep. 109:8).

While Ms. Wyatt was still in shock after learning that her daughter had been confronted alone about her sexuality by two teachers whom she was supposed to trust, Newell offered her the contact information for this "girlfriend" and retrieved the phone number from her cell phone. (Exhibit D, Wyatt Decl., paragraph 7). Soon thereafter, S.W. returned to the field. As she and Ms. Wyatt attempted to discuss what had transpired with Newell and Fletcher, Newell abruptly dismissed them both and refused to talk further (Exhibit C, S.W. Decl., paragraph 17; Exhibit D, Wyatt Decl., paragraph 8). After these events, Fletcher and Newell kicked S.W. off the softball team, placing her future educational opportunities in jeopardy.

Before Fletcher disclosed S.W.'s sexual orientation to Ms. Wyatt on March 3, 2009, Ms. Wyatt did not know that S.W. was gay (Exhibit D, Wyatt Decl., paragraph 6). Ms. Wyatt had asked S.W. if she was gay prior to March 3, 2009, but she had always denied it (Exhibit B, S.W. Dep. 60:3-7, 84:19-21). Hearing the news from a relative stranger before her daughter was disturbing and shocking for Ms. Wyatt.

Defendants' Fletcher and Newell's blatant violation of S.W.'s privacy and the surrounding controversy has caused S.W. severe emotional and mental anguish resulting in anxiety, loss of sleep, suicidal ideation, and self-mutilation (Exhibit F, Thorne Decl., p. 6). Defendants severely damaged her trust and respect in adult authority and caused her to suffer significant social ostracism. Moreover, Fletcher and Newell's actions demoralized S.W. Her academic performance suffered as a result, and her long-held ambition of attending college to study kinesiology and sports medicine, in emulation of her one-time role models, was destroyed (Exhibit C, S.W. Decl., paragraph 22).

Ms. Wyatt promptly informed both the school's principal, the assistant athletic director Douglas Duke, and Superintendent of Kilgore ISD Jody Clements of what had happened (Exhibit

D, Wyatt Decl., paragraph11). She shared her distress that S.W. had been confronted alone by two authority figures, that they had decided without S.W.'s permission to reveal incredibly private information about her, and the negative social consequences that her daughter was suffering as a result. Clements did nothing to investigate or discipline Fletcher and Newell, and did not even inform Ms. Wyatt of the possibility of filing a formal complaint until five months later (Exhibit D, Wyatt Decl., paragraph13). No disciplinary action was taken against Fletcher or Newell, effectively ratifying and condoning their behavior.

Ms. Wyatt has repeatedly attempted to resolve this matter through KISD procedures. After being informed belatedly that she could file a formal complaint, she filed a "Level One" complaint with the principal on August 24, 2009 (Exhibit D, Wyatt Decl., paragraph 14). The claims were dismissed as time-barred under KISD procedures, although Ms. Wyatt had not been informed of her right to file a complaint until after the time expired (Exhibit D, Wyatt Decl., paragraph 13).

Ms. Wyatt then filed a "Level Two" complaint with Superintendent Clements on September 16, 2009 to appeal the unsatisfactory results of the Level One hearing (Exhibit D, Wyatt Decl., paragraph 15). Clements' response merely defended the actions of Fletcher and Newell, and offered no remedy to S.W. for the injury she had suffered. (Exhibit H, Clements Dep. 96:16-22).

The coaches were actually just following KISD's policy mandates that teachers disclose students' sexual orientation to their parents. At the Level Two complaint and hearing, Defendants' formal justification provided for Fletcher and Newell's nonconsensual disclosure of S.W.'s sexual orientation was that they were "legally obligated to share this information with the parent" (Exhibit H, Clements Dep. 112:16-25; 113:1-16).

Ms. Wyatt then filed a "Level Three" complaint with the KISD Board of Trustees on October 30, 2009 (Exhibit D, Wyatt Decl., paragraph 16). The Board acted as a rubber stamp for KISD's actions, unanimously ratifying the decision of the coaches and its Superintendent, and declining to hold them responsible for what they had done to S.W. (Exhibit G, George Dep. 33:4-9). KISD has lost its recording of this proceeding, requiring an inference in Ms. Wyatt's favor for all matters in the missing portion of the record.  19 Tex. Admin. Code §157.1073(d) (2010).

KISD has a duty to promulgate, implement, and enforce policies and procedures that adequately protect students' private information against unlawful disclosure by staff. KISD, however, has indicated a policy of requiring staff to disclose students' sexual orientation to parents. Further, KISD has a policy of not training staff concerning their legal obligations in dealing with personal student information of a highly sensitive nature. Thus, KISD has breached its duty, which caused injury to S.W.

Defendants Fletcher, Newell, and KISD had no legitimate state interest in the disclosure of S.W.'s sexual orientation to her mother. Doing so was a severe and traumatic violation of her privacy, and lacked any legitimate academic, disciplinary, or administrative purpose.

Information about an individual's sexual orientation is intimate, sensitive information. A reasonable person would find the disclosure of such information without permission to be highly offensive and invasive. According to psychologist Steven Thorne, research and clinical experience "indicate that gay, lesbian, and/or bisexual teenagers who are forced to reveal their sexual preference(s) before they are ready are susceptible to compromised social, emotional, and behavioral functioning." (Exhibit F, Thorne Decl., p. 7).

S.W. suffered serious injury as a result of Fletcher and Newell's disclosure. In his evaluation of S.W., Dr. Thorne concluded that S.W. "experienced a good deal of psychological

tension and turmoil during (and since) the period of time she was reportedly 'outed' by her former high school softball coach." (*Id*. p.5). Dr. Thorne also notes: "As it relates to the specific trauma symptoms associated with reportedly having been 'outed' in March of 2009, [S.W.], as indicated previously, did report/endorse having previously experienced a variety of intense and recurrent thoughts/emotions relating to the incident, as well as suicidal ideation, self-mutilation, appetite and sleep disruption, and a loss of self-esteem achieved through academics and athletics" (*Id*.). Dr. Thorne concludes that S.W.'s psychological symptoms are attributable, at least in part, to "her emotional response to the reported incident in March of 2009." (*Id*.  p.7).

## III. STANDARD OF REVIEW

A defendant is only entitled to summary judgment if "there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A defendant who seeks summary judgment on a plaintiff's cause of action must demonstrate the absence of a genuine issue of material fact either by (1) submitting summary judgment evidence that negates the existence of a material element of plaintiff's claim or (2) showing there is no evidence to support an essential element of plaintiff's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986). Defendants cannot rely on conclusory statements to establish Plaintiffs have not presented evidence on an essential element of their claim. Rather, Defendants must demonstrate an absence of genuine factual dispute. *See Celotex Corp.*, 477 U.S. at 327. The facts must be viewed in the light most favorable to Plaintiffs. *See Horton v. City of Houston*, 179 F.3d 188, 191 (5th Cir. 1999). Only if Defendants meet their burden are Plaintiffs required to respond by summary judgment proof to show a genuine issue of material fact. Fed. R. Civ. P. 56(e). To be entitled to summary judgment, Defendants must demonstrate an absence of genuine factual disputes, not merely assert evidence does not exist.

## IV. ARGUMENT

Plaintiff's claims are not barred by the administrative exhaustion requirement of the Texas Education Code, because the requirement does not operate to bar suits for violations of constitutional rights. Defendants violated S.W.'s right to privacy under the United States and Texas Constitutions. Kilgore ISD is liable for these violations because its policy requires employees to disclose students' sexual orientation to parents. Fletcher and Newell are liable for these violations because they disclosed private information (namely, S.W.'s sexual orientation) to her mother without her consent or any compelling interest. In so doing, they also committed an invasion of S.W.'s privacy under Texas common law by intentionally and unreasonably intruding upon S.W.'s private affairs in a manner that would be highly offensive to a reasonable person. Defendants Fletcher and Newell also violated S.W.'s Fourth Amendment right against unreasonable seizure when they detained her in a locked room to intimidate and interrogate her without sufficient cause. Fletcher and Newell are not entitled to qualified immunity because S.W.'s rights were clearly established at the time of the violation, and Defendants' actions were not objectively reasonable.

### A. There Is a Genuine Issue of Material Fact

At its core, this case concerns a factual dispute. The Federal Rules of Civil Procedure allow for summary judgment only when there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a). Between the parties, there are 30 separate sources of evidence – 15 from each side. There are simply too many credible but contradictory facts and evidence to determine that there is no issue of genuine material fact at this stage.

Defendants attempt to present inadmissible evidence, and in the process ignore the proper evidence that contradict their claims.[1] S.W., Defendants Fletcher and Newell, Ms. Wyatt, and the KISD Board are the witnesses who have personal knowledge of the events giving rise to this lawsuit, and they give very different accounts of those events. In the end, Defendants' motion for summary judgment is an exercise in futility; all parties have differing but reasonable interpretations of the facts, and it is within the sole province of the jury to evaluate those interpretations and come to a conclusion as to their relative merits. The factual disputes presented by this case and the need to weigh the credibility of the various witnesses necessarily preclude summary judgment.

B. Plaintiff's Claims Are Not Barred for Failure to Exhaust Administrative Remedies

Defendants cannot avoid Ms. Wyatt's claims based on administrative exhaustion in an action under 42 U.S.C. § 1983. Section 22.0512 of the Texas Education Code (cited by Defendants) does not operate to bar lawsuits for violation of federal and/or state constitution rights even where administrative remedies are not exhausted. *Moore v. Port Arthur Independent School Dist.*, 751 F.Supp. 671 (E.D.Tex.1990); *Doe v. S & S Consol. I.S.D.*, 149 F.Supp.2d 274 (E.D.Tex. 2001). Even if Ms. Wyatt had not exhausted her administrative remedies, her federal and state constitutional claims would not be barred.

Ms. Wyatt and her daughter did make sincere efforts to utilize the administrative process and exhaust their remedies. Ms. Wyatt promptly informed the high school principal, athletic director Douglas Duke, and Superintendent Clements of the March 3, 2009 events (Exhibit D,

---

[1] Defendants rely extensively on affidavits containing inadmissible hearsay and speculation. *See* Section XI, *infra,* Plaintiff's Objection to inadmissible evidence and Motion to Strike. Affidavits offered by Defendants also contain conspicuously similar language, calling their credibility into question. Defendants have refused to disclose who was involved in the preparation of the affidavits or the extent of their involvement. (Exhibit O, Kilgore ISD Int. 16).

Wyatt Decl., paragraph 11). Clements did not investigate the situation or discipline Fletcher and Newell in any way, and did not inform Ms. Wyatt of the possibility of filing a formal complaint until five months later (Exhibit D, Wyatt Decl., paragraph 13).

Although Ms. Wyatt's initial complaint was not filed within 15 days of March 3, 2009, she did proceed through the prescribed KISD process as soon as Clements informed her of it. The Superintendent and Board of Trustees both considered and ruled on Ms. Wyatt's complaints. KISD officials had multiple opportunities to address and rectify Fletcher and Newell's misconduct, but they refused to afford S.W. any remedy.

C. Plaintiff Has No Claims Against Defendant Douglas Duke

Plaintiff has filed an unopposed motion to dismiss Defendant Douglas Duke from this action with prejudice. The Court need not consider Mr. Duke in this motion for summary judgment.

D. There is a Genuine Issue of Material Fact as to Municipal Liability Under 42 U.S.C. §1983

"Municipal liability under 42 U.S.C. §1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights, whose 'moving force' is the policy." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (*citing Monell v. Dep't of Social Services*, 436 U.S.'658 (1978). The summary judgment evidence establishes that the Kilgore ISD school board was the policymaker, the board promulgated official policies, and those official policies were the "moving force" behind the violation of S.W.'s right to privacy. In fact, KISD has municipal liability under two different theories: that (a) its policy was that students' sexual orientation should be disclosed to parents – a policy its coaches followed and its board ratified, and (b) KISD failed to train its employees on disclosure of the confidential sexual

10

orientation of a student, which led to the Defendants demanding this information from S.W. without her consent and then disclosing it to her mother.

### 1. The School Board is the Policymaker for Kilgore ISD

A policymaker is one who has final policy-making authority, in contrast to one who only has decision-making authority. *See Pembauer v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Whether a particular defendant is considered a final policymaker is determined as a matter of state law. *Jett v. Dallas Indep. Sch. Dist.*, 7 F.3d 1241, 1244 (5ᵗʰ Cir. 1993).

Texas law clearly establishes that the school board, not the superintendent or any other official, has final authority. Section 11.151(b) of the Texas Education Code provides that the board of trustees of an independent school district has "the exclusive power to govern and oversee the management of the public schools of the district." Section 11.1512 confirms that the superintendent "shall, on a day-to-day basis, ensure the implementation of the policies created by the board." Kilgore ISD has admitted that Superintendent Clements is not the final policymaker (Exhibit I, Kilgore ISD RFA #6), and School Board President Terry George confirmed that "the board has final approval of all ... policies." (Exhibit G, George Dep. 65:14-15).

### 2. The School Board Promulgated Official Policies Governing Teacher Behavior

The Kilgore ISD written policies governing teacher behavior are set forth in the Kilgore ISD Employee Handbook (Exhibit H, Clements Dep. 26:18-20). While the superintendent compiles the handbook, the Board has final approval power over its contents. (*Id*. 26:21 – 27:4). Yet KISD fails to train its employees at all on the confidentiality of a student's sexual orientation in its handbook (Exhibit J, KISD Employee Handbook 2008-2009) or to offer any training to its employees. (Exhibit H, Clements Dep. 15:8-10). At the beginning of the year, teachers are

required to review the handbook in full and sign a form stating they have done so. (*Id*. 28:9-14). Yet there is nothing in the handbook for them to follow on this crucial topic.

The Board's ruling on S.W.'s Level 3 grievance is separately sufficient to establish the existence of an official policy beyond those contained in the handbook. A policy need not be a written statement, ordinance, or regulation. *See Piotrowski*, 237 F.3d at 568. A single act or decision may constitute policy, so long as that policy was made by an official policymaker. *Pembauer*, 475 U.S. at 480. By ratifying the coaches' actions, the Board – the official policymaker – confirmed that KISD's policy requires its teachers to disclose its students' sexual orientation to their parents. KISD's unwritten policy was put in writing by KISD in its decision of Ms. Wyatt's Level Two hearing: "Coach Fletcher and Newell were legally obligated to share this information with the parent." (Exhibit P, KISD Level Two Hearing Decision, KISD00062, Section 3.1. Plaintiff has created a genuine issue of material fact by pointing to this "policy statement formally announced by an official policymaker." *See Zarnow v. City of Wichita Falls*, 614 F.3d 161, 166 (5th Cir. 2010).

### 3. *The School Board's Failure to Train Its Employees to Properly Handle Issues Pertaining to Sexual Orientation Was a "Moving Force" Behind the Violation of S.W.'s Right to Privacy*

In order to establish a claim for failure to train under §1983, the plaintiff must show  that there was a failure to train, a causal link exists between the failure to train and the violation of plaintiff's rights, and the failure to train amounts to "deliberate indifference." The summary judgment evidence creates a genuine issue of material fact as to all three elements.

Kilgore ISD's complete lack of guidance regarding issues pertaining to sexual orientation constitutes a gross failure to train its employees. Confidentiality of a student's sexual orientation was discussed nowhere in the handbook given to teachers for the 2008-2009 school year. (Exhibit J, KISD Employee Handbook 2008-2009). Even if it were, KISD makes no effort to

confirm that the teachers actually read the handbook (Exhibit H, Clements Dep. 28:15-18). Clements admitted that KISD gives its teachers no specific training related to students' sexual orientation. (*Id*. 15:8-10). There have been and continue to be no protections afforded by Kilgore ISD policy against cruel and wanton revelation by teachers of students' sexual orientation.

The disclosure of S.W.'s sexual orientation to her mother was an inevitable consequence of KISD's failure to train its employees. Coaches Newell and Fletcher claim that they disclosed S.W.'s relationship with Hillary Nutt because they wanted to notify her that S.W. "might be the victim of a crime." (Exhibit K, Fletcher Int. 3; Exhibit L, Newell Int. 3). Even ignoring their failure to understand the law, they had no personal knowledge regarding the relationship between S.W. and Ms. Nutt. (*Id*). They had no reason whatsoever to believe that the relationship was sexual. (*Id*). Their assessment that that relationship was "inappropriate" was based entirely on rumor. (*Id*). If policies protecting S.W.'s right to privacy had been in place, the coaches would not have been allowed to disclose S.W.'s sexual orientation to her mother merely on what amounted to no more than a speculative hunch.

Additionally, there is a genuine issue of material fact as to whether the reasons the coaches gave for telling S.W.'s mother about her relationship with Ms. Nutt were just a pretext for retaliating against S.W. According to S.W., Newell and Fletcher were so angry during the incident in the locker room that she became afraid they would strike her (Exhibit C, S.W. Decl., paragraph 10). They raised their voices and told her she could be sued for slander for the rumor they claimed she spread about Newell. (Exhibit C, S.W. Decl., paragraph 9; Exhibit H, Clements Dep. 59:25–60:9). They told her she would not be allowed to play softball until they disclosed the relationship to her mother. (Exhibit C, S.W. Decl., paragraph 14). If Kilgore ISD had

properly trained their coaches to respect S.W.'s privacy rights, Newell and Fletcher would not have used a student's sexual orientation as a weapon against her.

KISD's failure to train its teacher' was the result of deliberate indifference to issues of sexual orientation. The incident in the locker room was not the first time a KISD official confronted S.W. about her sexual orientation. KISD teachers told her, "Tonight is not a night for alternative lifestyles" when she arrived at prom with a female date, and refused to let her in. (Exhibit B, S.W. Dep. 111:23-25). Superintendent Clements admitted in deposition that, even after one of his principals informed him of at least one incident involving a teacher not allowing a same sex couple to attend prom, he still feels no need for a policy expressly stating they should be admitted. (Exhibit H, Clements Dep. 105:9-18). Even though the need for clarification has been demonstrated and enacting such a policy would require minimal effort, the district refuses to act to prevent future incidents of discrimination.

KISD's Superintendent expressed further indifference to providing training on policies specifically protecting sexual orientation, claiming that, if the district offered such training, "there's [sic] going to be 10 or 12 other groups that want a specific thing that they have." (Id. 92:1-18). The District apparently considers the potential burden caused by more students asserting their rights too great to justify putting a policy in place to prevent the kind of trauma suffered by S.W. as a result of the coaches' actions. There is at least a genuine issue of material fact as to whether Kilgore ISD acted with deliberate indifference, and thus Plaintiff's failure-to-train claim should survive summary judgment.

*4. The School Board's Ratification of the Coaches' Actions Confirms the Existence of a Facially Unconstitutional Policy of Disclosing Students' Sexual Orientation*

In a Section 1983 suit, Plaintiff does not have to overcome the "deliberate indifference" standard if the policy in question is itself unconstitutional. *See Monell*, 436 U.S. at 663. KISD's

ratification of its employees' violation of S.W.'s privacy rights is just that. Allowing suits to move forward where officials were "deliberately indifferent" to an individual's rights is an expansion of the remedy provided by §1983 when a state statute or policy is unconstitutional on its face. *Id.* at 686. There is a genuine issue of material fact as to whether the policy requiring teachers to disclose the sexual orientations of their students to their parents announced when the school board ratified the coaches' actions is unconstitutional. Defendants' refusal to disclose the school board's deliberation process as to their ratification of the coaches' actions even further problematizes any fact-based analysis of the considerations that went into their decision. Thus, the claim should survive summary judgment as to municipal liability.

E. Defendants Violated S.W.'s Right to Privacy Under the U.S. Constitution

"In the context of government disclosure of personal matters, an individual's right to privacy is violated if: the person had a legitimate expectation of privacy, and that privacy interest outweighs the public need for disclosure." *Cantu v. Rocha*, 77 F.3d 795, 806 (5th Cir. 1996). There is a genuine issue of material fact that S.W. had a legitimate expectation of privacy to her sexual orientation with regard to her own mother, and her privacy interest outweighed Defendants' interest – if any – in telling her mother that she was dating a girl. There is also credible evidence in the record showing that Defendants were the first people to disclose S.W.'s sexual orientation to her mother and that was their true intent, not incoherent reliance on the penal code.

*1. S.W. Had a Legitimate Expectation of Privacy
in Information about Her Sexual Orientation*

The U.S. Supreme Court has recognized an individual privacy interest in "avoiding disclosure of personal matters." *Whalen v. Roe*, 429 U.S. 589, 599 (1977).  "This 'disclosural privacy' encompasses the ability of individuals to determine for themselves when, how, and to

15

what extent information about them is communicated to others." *In re Crestcare Nursing and Rehabilitation Center*, 222 S.W.3d 68, 73 (Tex.App.—Tyler 2006, no pet.) (citing *Indus. Found. of the S. v. Tex. Indus. Accident Bd.,* 540 S.W.2d 668, 679 (Tex. 1976)).

An individual has a legitimate expectation of privacy in information relating to "the most intimate aspects of human affairs" *Zaffuto v. City of Hammond*, 308 F.3d 485, 490 (5th Cir. 2002) (citing *Wade v. Goodwin*, 843 F.2d 1150, 1153 (8th Cir. 1988)). Privacy protection extends to "intimate personal relationships or activities, and freedoms to make fundamental choices involving oneself, one's family, and one's relationship with others." *Klein Indep. Sch. Dist. v. Mattox*, 830 F.2d 576, 580 (5th Cir. 1987).

Courts recognize that explicitly identified sexual orientation as the kind of deeply intimate, private information that is entitled to protection under *Whalen*, calling the confidential nature of such information "obvious." *Sterling v. Borough of Minersville*, 232 F.3d 190, 198 (3d Cir. 2000). Even Defendants concede that students have a legitimate expectation of privacy in information about their sexual orientation (Exhibit E, Newell Dep. 32:17-21).

*2. S.W.'s Privacy Interest Outweighed the Need for Disclosure*

Defendants' excuses do not alter the reality that they violated S.W.'s clearly established constitutional rights by disclosing deeply private information about her without any compelling governmental interest in doing so. In their acts against S.W., no KISD employee actually attempted to follow Texas Penal Code §22.011, which criminalizes sexual molestation of minors by adults. Newell and Fletcher had no knowledge of any sexual contact between S.W. and Ms. Nutt when they told her mother S.W. was dating a girl. That was because the two did not have any such relationship, or anything approaching it. Even had Defendants possessed such knowledge, Section 22.011 contains an affirmative defense for legal adults who are not more

16

than three years older than the legal child with whom they have sexual contact. Tex. Penal Code §22.011(e)(2)(A). When Defendants violated S.W.'s rights, was 16 years old and Ms. Nutt was 18 years old (Exhibit C, S.W. Decl., paragraph 6; Exhibit N, Hillary Nutt Decl., paragraph 2). Even assuming *arguendo* they had a sexual relationship at the time – which they did not and never did - there was no way the Penal Code could have been a concern because there were only two years' difference in age.

Further, even if Newell and Fletcher had been reasonably and legitimately concerned about S.W.'s safety and welfare, disclosing her relationship with Hillary Nutt to her mother was not the appropriate, let alone legally required, course of action. The Texas Family Code requires teachers and coaches to report suspicions of child abuse or neglect, but requires that such information be reported to an appropriate government actor or agency, not to the child's parent. Tex. Fam. Code §261.103.

KISD policies indicate that an employee who believes that a child is in danger should make a report to the appropriate state agency and the principal of the child's campus, not to the child's parent (Exhibit J, KISD Employee Handbook 2008-2009, pp. 29-30). According to educational consultant Kristine Vowels, Ed.D., Fletcher and Newell's actions "were not a reasonable response to any potential concerns they may have had regarding S.W. or her welfare." (Exhibit M, Vowels Decl., p.5).

Moreover, Defendants admitted repeatedly that they do not attempt to notify parents or authorities when heterosexual students or 16 years of age or less have romantic relationships with 18 year olds. (Exhibit G, Deposition of Terry George, 60:7-62:21), Exhibit H, Deposition of Jody Clements, 21:19-26:14). The evidence shows that KISD only raised this concern as a

17

subterfuge when a disclosure of a gay relationship was at issue. Defendants Newell and Fletcher had no good reason, let alone any compelling interest, to disclose S.W.'s sexual orientation to her mother. There is a genuine issue of material fact that the real reason for the disclosure was that they wanted to make Barbara Wyatt aware that her daughter was a lesbian.

*3. Defendants Fletcher and Newell Disclosed S.W.'s Sexual Orientation to Her Mother*

Defendants have argued that they did not disclose S.W.'s sexual orientation because they did not use the words "gay" or "lesbian" in their discussion. This argument is specious, as Fletcher and Newell used the word "girlfriend" to describe Ms. Nutt's relationship to S.W. and said they were "dating" (Exhibit D, Wyatt Decl., paragraph 5; Exhibit A, Wyatt Dep. 109:9). This had precisely the same effect as using specific terminology to describe S.W.'s sexual orientation.

Barbara Wyatt entered the conversation with Fletcher and Newell on March 3, 2009 not knowing her daughter was interested in women (Exhibit D, Wyatt Decl., paragraph 6). Over the course of the conversation, Fletcher and Newell very clearly communicated that S.W. was dating a woman, and the intended understanding that S.W. was gay (Exhibit D, Wyatt Decl., paragraphs 5-6). It is not the particular words that Fletcher and Newell say they chose, but on the message they intended to, and did, convey.

Defendants' assertion that they only provided detailed information about S.W.'s relationship with Hillary Nutt when Ms. Wyatt requested it is untrue. Ms. Wyatt did not request any information from them about S.W.'s sexual orientation or dating life. (Exhibit A, Wyatt Dep. 110:2-3). She accepted Newell's offer of Ms. Nutt's phone number, but only after Fletcher and Newell had revealed S.W.'s sexual orientation. Barbara Wyatt did not solicit the private

information that Fletcher and Newell disclosed, and they cannot defend their actions on that ground.

### 4. Defendants' Disclosure of S.W.'s Sexual Orientation Is Actionable under §1983

Defendants' argument that their threats did not violate S.W.'s rights is tangential because they went beyond threats to full disclosure. Defendants cite *Lamar v. Steele*, 698 F.2d 1286 (5th Cir. 1983), for the contention that "mere words" cannot constitute a §1983 violation, but their reliance on *Lamar* is misplaced. That case concerned an inmate's allegations of denial of access to court, based in part only on guards' threats. On a motion for rehearing en banc, the court held: "Threats alone are not enough. A Section 1983 claim only accrues when the threats or threatening conduct result in a constitutional deprivation." *Id*. at 1286. Defendants deprived S.W. of her privacy rights in this case.

Defendants' reliance on *McFadden v. Lucas*, 713 F.2d 143 (5th Cir. 1983), is likewise flawed. In that case, the Fifth Circuit held that threats of violence by custodial officers did not themselves constitute a constitutional deprivation under §1983, whereas actual physical violence would give rise to a valid claim. *Id*. at 146. Once again, a threat to violate a constitutional right is not actionable, but the actual violation is.

This case is not about Defendants' threats to tell Ms. Wyatt that S.W. was dating a girl. They admit they went ahead and told this to S.W.'s mother. Fletcher and Newell violated S.W.'s constitutional rights by disclosing her sexual orientation to her mother, not by merely threatening to disclose it. The constitutional deprivation was complete, and S.W.'s §1983 claims are valid.

### F. Defendants Fletcher and Newell Are Not Entitled to Qualified Immunity

Government officials are not entitled to qualified immunity in §1983 constitutional privacy suits where the plaintiff can demonstrate that her clearly established rights were violated

and the official's conduct was not objectively reasonable. *Leibowitz v. City of Mineola*, 660 F.Supp.2d 775 (E.D. Tex. 2009). Qualified immunity will be defeated where an official "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury." *Id*. at 789 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982)). Courts should determine: whether the plaintiff's constitutional rights were violated, whether the right was clearly established at the time of the violation, and whether the official's conduct was objectively reasonable. *Id*.

Fletcher and Newell violated S.W.'s constitutionally protected right to privacy when they interrogated her about her sexual orientation and then disclosed her it to her mother without her consent. This right was clearly established at the time of the violation, as there is long-standing Texas precedent indicating that privacy protection extends to "intimate personal relationships or activities, and freedoms to make fundamental choices involving oneself, one's family, and one's relationship with others" and "the most intimate aspects of human affairs." *Klein Indep. Sch. Dist. v. Mattox*, 830 F.2d 576, 580 (5th Cir. 1987); *Zaffuto v. City of Hammond*, 308 F.3d 485, 490 (5th Cir. 2002) (citing *Wade v. Goodwin*, 843 F.2d 1150, 1153 (8th Cir. 1988)).

Information about a student's sexual orientation is clearly intimate, private, and protected, despite the paucity of case law addressing the disclosure of sexual orientation in the Fifth Circuit. The Third Circuit has explicitly denied qualified immunity involving forced disclosure of sexual orientation despite an absence of precedent. That Court first held that the plaintiff's sexual orientation was "an intimate aspect of his personality entitled to privacy protection under *Whalen*." *Sterling v. Borough of Minersville*, 232 F.3d 190, 195-96 (3d Cir. 2000). "Because the confidential and private nature of the information was obvious, and because the right to privacy

is well-settled, the concomitant constitutional violation was apparent notwithstanding the fact that the very action in question had not previously been held to be unlawful." *Id*. at 197-98.

The *Sterling* court explicitly distinguished a Fourth Circuit case from a decade earlier that had summarily reached the opposite conclusion on whether sexual preference was entitled to constitutional privacy protection in reliance on the now-overturned *Bowers v. Hardwick*, which was still good law at the time. The case, *Walls v. City of Petersburg*, 895 F.2d 188 (4th Cir. 1990), is distinguishable because is did not reach the issue of privacy, but instead focused on "whether a state could constitutionally prohibit certain consensual homosexual conduct." *Sterling*, 232 F.3d 190 at 195 n.3. In twenty years, *Walls* has only been cited four times for its holding on the privacy status of sexual orientation: once in *Sterling* itself (the only appellate decision referencing it on this point), twice by district courts who criticized or distinguished it, and only once in support of qualified immunity against liability for disclosure of sexual preference (in *Dawson v. State Law Enforcement Div.*, 1992 WL 208967 (D.S.C. 1992)). Since the *Walls* and *Dawson* decisions, *Bowers v. Hardwick* has been overruled by *Lawrence v. Texas*, 539 U.S. 558 (2003).

Fletcher and Newell knew or reasonably should have known that their actions would violate S.W.'s constitutional rights. Newell herself admitted that students have a legitimate expectation of privacy in information about their sexual orientation (Exhibit E, Newell Dep. 32:17-21). While Defendants have argued that Ms. Wyatt knew her daughter's sexual orientation prior to their disclosure, Ms. Wyatt has testified that she did not, and neither Fletcher nor Newell had actual knowledge on which to base such an unbelievable assertion.

In reaching its decision, the *Sterling* Court concluded that the defendant "could not reasonably have believed that his questioned conduct was lawful in light of the established law

21

protecting privacy rights." *Sterling*, 232 F.3d at 198. The same is true in this case. Given the obviously intimate and private nature of sexual orientation, Defendants could not reasonably have believed that interrogating S.W. about her dating life and then disclosing her sexual orientation to her mother did not violate her privacy. In fact, they knew their actions were unconstitutional, as evidenced by Newell's admission that sexual orientation is private.

G. Defendants Violated S.W.'s Right to Privacy Under the Texas Constitution

The Texas Constitution guarantees a right to privacy similar to, and sometimes greater than, the right created by the U.S. Constitution. *City of Sherman v. Henry*, 928 S.W.2d 464 (Tex. 1996). The right "protects personal privacy from unreasonable intrusion" and "should yield only when the government can demonstrate that an intrusion is reasonably warranted for the achievement of a compelling governmental objective that can be achieved by no less intrusive, more reasonable means." *Texas State Employees Union v. Texas Dept. of Mental Health and Mental Retardation*, 746 S.W.2d 203, 205 (Tex. 1978).

Newell and Fletcher violated S.W.'s right to privacy under the Texas Constitution and common law when they interrogated her about her dating life and then disclosed her sexual orientation to her mother without her consent or any compelling governmental interest (Exhibit C, S.W. Decl., paragraph 6; Exhibit A, Wyatt Dep. 109:9). There was no need for Fletcher and Newell to inquire as to the nature of S.W.'s relationship or to disclose it to her mother.

As discussed *supra*, Fletcher and Newell's concerns were based on pure speculation and unreasonable misinterpretation of the law. Even if their concerns had had currency, they did not follow Texas law or KISD policy with respect to reporting suspicions of child endangerment. They did not report their concerns to the campus principal or any state agency, but instead informed S.W.'s mother that S.W. was dating a girl. Even if disclosure of S.W.'s relationship with

Ms. Nutt had been justified in some capacity by legitimate safety concerns, it was inappropriate and unreasonable for Fletcher and Newell to disclose the information to Ms. Wyatt and not to the relevant school or state authority.

H. Fletcher and Newell Violated S.W.'s Fourth Amendment Right Against Unreasonable Seizure

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Terry v. Ohio*, 392 U.S. 1, 8 (1968). To determine the reasonableness of a search or seizure, courts must balance the government's interest against the "invasion which the search entails." *Id*. at 19. "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Id*. at 9 (internal citations omitted).

Fletcher and Newell violated S.W.'s Fourth Amendment right against unreasonable seizure when they detained her in the locked room, using their authority as school officials. S.W. was made to feel that she had to enter the locker room and was not free to leave. (Exhibit C, S.W. Decl., paragraph 4). Fletcher and Newell locked the door behind them, then proceeded to confront, interrogate, and threaten S.W. and did not release her until someone knocked on the door from the outside (Exhibit C, S.W. Decl., paragraphs 6, 7, 9, and 15).

Defendants have argued that S.W. was entitled to a lesser expectation of privacy than members of the general public because she was in a "school environment" at the time of the seizure. *Milligan v. City of Slidell, La.*, 226 F.3d 652, 655 (5th Cir. 2000). However, the seizure occurred off campus and outside school hours (Exhibit C, S.W. Decl., paragraph 3). Therefore, cases indicating a lesser standard for Fourth Amendment violations in the school context are not applicable.

23

*Milligan*, on which Defendants rely most heavily, involved a principal detaining and questioning a student in his office based on rumors that a fight was about to begin. *Id*. at 653. The Fifth Circuit upheld the principal, deciding that the school's interest in preventing a fight outweighed the student's right to be free from interrogation in the principal's office. *Id*. at 655. *Milligan*'s facts are clearly distinguishable from the facts of this case. The principal's seizure in *Milligan* was to prevent imminent physical violence and possible serious injury to students.

Fletcher and Newell detained and interrogated S.W. in a locked room in order to confront her about her sexual orientation, her dating life, and team gossip (Exhibit C, S.W. Decl., paragraphs 4, 6, and 7). There was no threat of imminent violence or injury, and there is a genuine issue of material fact that Defendants' interest in detaining S.W. by no means exceeded her right to be free from seizure.

I. Defendants Fletcher and Newell Invaded S.W.'s Privacy Under Texas Common Law

A claim for invasion of privacy under Texas common law requires a showing that the defendant intentionally and unreasonably intruded upon the plaintiff's private affairs or concern and that such intrusion would be highly offensive to a reasonable person. *Valenzuela v. Aquino*, 853 S.W.2d 512, 513 (Tex. 1993). Fletcher and Newell intentionally interrogated S.W. about her relationship with Ms. Nutt and intentionally disclosed her sexual orientation to her mother. Fletcher and Newell's actions were unreasonable and unwarranted, and would be highly offensive to a reasonable person. Their actions also resulted in significant injury to S.W.

Fletcher and Newell have not raised the affirmative defense of official immunity, thus they remain liable to S.W. in their individual capacities. *See Telthorster v. Tennel*, 92 S.W.3d 457, 460 (Tex. 2002). Fletcher and Newell are not entitled to qualified immunity as state actors because they unreasonably violated S.W.'s clearly established constitutional right to privacy.

24

J. S.W.'s Request for  Declaratory Judgment is Well-Founded

S.W. seeks a declaratory judgment that Fletcher, Newell, and Kilgore ISD violated her constitutional rights. As discussed *supra*, Fletcher and Newell violated S.W.'s right to privacy under the Texas and U.S. Constitutions by interrogating her about her sexual orientation and then disclosing it to her mother without consent. Kilgore ISD has the unconstitutional policy and practice of disclosing students' sexual orientation to parents. Therefore, S.W. is within her rights to seek a declaratory judgment to prevent the disclosure of students' sexual orientation information in the future.

## V. OBJECTION TO DEFENDANTS' RELIANCE ON INADMISSIBLE EVIDENCE TO SUPPORT THEIR MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE

In a motion for summary judgment, materials cited to support a fact must be presented in a form that would be admissible at trial. FED. R. CIV. P. 56(c)(2). The affidavits of Jalissa Baggett, Harold Ray "Trey" Guin, Meagan Youngblood, Summer Williams, Chelsea Warren, and Candice Meadows (provided by Defendants in support of their Motion) include inadmissible hearsay, speculation, and opinion testimony. (Defendants' Exhibits 9-14). These affidavits contain inadmissible statements about what "everyone knew," speculation outside personal knowledge about Ms. Wyatt's level of knowledge of her daughter's sexual orientation, speculation about S.W.'s thoughts and motivations, and speculation and opinions about why S.W. was removed from the softball team. The affiants are not experts, but have drawn conclusions based on hearsay and discuss subjects outside their personal knowledge. They cannot offer opinion evidence. Plaintiff objects to Defendants' use of inadmissible evidence and respectfully asks the Court to strike all of Defendants' improper evidence.

The use of these affidavits as key evidentiary support also emphasizes the weakness of Defendants' motion and the reason why it should be denied. All of the affidavits are written using

the same words in the same fashion. They hardly appear to be credible accounts offered freely by high school students, but an assembly line of lawyer-written narratives designed to cloud the facts. Defendants have refused to disclose who was involved in the preparation of the affidavits or the extent of their involvement. (Exhibit O, Kilgore ISD Int. 16). At its heart, this case remains a factual dispute, and the Court should let it be determined where genuine issues of material fact must be resolved – at trial.

## VI. CONCLUSION

The summary judgment evidence presents a genuine issue of material fact on all of Plaintiff's claims. Therefore, the Court should deny Defendants' Motion for Summary Judgment.

Dated: October 4, 2011

Respectfully Submitted,

/s/ Wayne Krause
Wayne Krause
State Bar No. 24032644
James C. Harrington
State Bar No. 09048500

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, Texas 78741
 (512) 474-5073 [phone]
 (512) 474-0726 [fax]

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I certify that on October 4, 2011, I electronically filed the foregoing with the Court Clerk using the CM/ECF system which will send notification of such filing to Defendants' counsel, David Iglesias and Robert Davis, Flowers Davis, P.L.L.C., 1021 ESE Loop 323, Suite 200, Tyler, Texas 75701.

/s/ Wayne Krause
Wayne Krause