IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| **BARBARA WYATT, as next** | § | |
| **friend of her minor daughter, S.W.** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. 6:10-cv-674** |
| | § | |
| **KILGORE INDEPENDENT SCHOOL** | § | |
| **DISTRICT, RHONDA FLETCHER,** | § | |
| **and CASSANDRA NEWELL, in their** | § | |
| **personal capacities,** | § | |
| | § | |
| *Defendants*. | § | |

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On December 12, 2010, Plaintiff Barbara Wyatt ("Plaintiff" or "Ms. Wyatt") filed this action

against Kilgore Independent School District ("KISD"), Rhonda Fletcher, and Cassandra Newell

alleging various causes of action stemming from an incident that occurred on March 3, 2009

involving S.W., then a 16 year old minor, and the coaching staff of KISD's softball team.[1]  Before

the Court is Defendants' Motion for Summary Judgment (Doc. No. 41)("MOTION").  Plaintiff filed

a response (Doc. No. 54)("RESPONSE") to which Defendants filed a reply (Doc. No. 57)("REPLY").

A hearing was held on October 13, 2011.  *See* (Doc. No. 59).  Due to multiple unresolved questions

of fact, the motion is **DENIED** in its entirety.

## BACKGROUND

*Plaintiff's Version of the Facts*

Plaintiff contends that Coaches Newell and Fletcher ("the Coaches") called an unscheduled

---

[1]Plaintiff's original complaint named Kilgore High School's assistant athletic director, Douglas Duke.  *See* COMPLAINT (Doc. No. 1) at ¶ 9.  The Court later granted Plaintiff's motion to file an amended complaint and dismiss Duke (Doc. 51).  *See* (Doc. No. 55).

softball team meeting on March 3, 2009 at the usual off campus playing field. RESPONSE at 2. The Coaches dismissed the remainder of the team, lead S.W. into an empty locker room, and locked the door behind them. *Id.* At this time the Coaches began questioning S.W. about her relationship with an older woman named Hillary Nutt. *Id.* at 2-3. Fletcher also accused S.W. of spreading a rumor that Ms. Nutt was "Coach Newell's ex-girlfriend." *Id.* at 3. S.W. initially denied the Coaches' accusations, which angered the Coaches. *Id.* Fletcher proceeded to advance in close on S.W., yelling at her, threatening to sue her for slander and calling her a liar. *Id.* at 3. Eventually, S.W. admitted that she and Ms. Nutt were dating even though at the time of the confrontation, S.W. and Ms. Nutt had arranged a date but were not "dating." *Id.* The Coaches then threatened to tell S.W.'s mother that she was gay and having a sexual relationship with another woman. *Id.* During the conversation, the Coaches made it clear that S.W. would not be allowed to play softball until they told her mother this information. *Id.*

Shortly after this conversation, the Coaches met with Ms. Wyatt and "Fletcher revealed S.W.'s sexual orientation to her mother by telling Ms. Wyatt that S.W. was dating a girl whom Fletcher described as S.W.'s 'girlfriend.'" *Id.* at 3. Newell then offered Ms. Wyatt the contact information for Ms. Nutt. *Id.* Plaintiff contends that prior to the March 3, 2009 incident, Ms. Wyatt did not know that her daughter was homosexual but had previously asked S.W. if she was gay, which S.W. consistently denied. *Id.* at 4.

Ms. Wyatt informed the Kilgore High School athletic director, Douglas Duke, the school's principal, and the KISD superintendent, Jody Clements about what happened. RESPONSE at 10. At this time, Clements neither investigated the incident nor informed Ms. Wyatt of the possibility of filing a formal complaint. *Id.* When she was informed of the grievance process five months later,

Ms. Wyatt filed a Level One grievance with the principal of Kilgore High School alleging that the Coaches acted inappropriately by disclosing S.W.'s sexual orientation. *Id.* at 5. This initial grievance was summarily dismissed as time barred under KISD procedure, however, Ms. Wyatt subsequently filed a Level Two grievance with Superintendent Jody Clements who issued a written report responding to Ms. Wyatt's allegations. *See id*; *see also* (Doc. No. 54-16)("LEVEL TWO REPORT"). The report defended the Coaches' actions, finding that "Coach Fletcher and Newell are legally obligated to share this information with the parent," which Plaintiff interprets as a policy requiring teachers to disclose students' sexual orientation to their parents. RESPONSE at 5; *see also* LEVEL TWO REPORT at 4. Ms. Wyatt then filed a Level Three grievance with the KISD Board of Trustees ("the Board"), which held a hearing allowing both Ms. Wyatt and Superintendent Clements the opportunity to speak. *See* RESPONSE at 6. The Board summarily denied Ms. Wyatt's appeal without opinion. *Id.*

*Defendants' Version of the Facts*

Defendants argue that S.W. was openly gay for several years prior to the incident and never attempted to keep her sexuality secret. MOTION at 4. Moreover, Defendants argue that S.W. was not a serious athlete and regularly disregarded team rules, making it difficult for her to be coached. *Id.* at 5-6. Prior to joining the team, S.W. and Ms. Wyatt were required to sign a permission slip specifically limiting the persons with whom S.W. could ride to practice and games. *Id.* at 6. S.W. broke this rule by riding to practice with Ms. Nutt on at least one occasion. *Id.*

On March 3, 2009, the Coaches became aware of a rumor created by a note written by S.W. that claimed S.W. was dating Ms. Nutt, a person S.W. claimed to be Coach Newell's ex-girlfriend. *Id.* at 6-7. *Id.* at 7. When the Coaches heard the rumor, they took it upon themselves to confront

3

S.W. for three reasons: (1) they believed that Ms. Nutt was a bad influence on S.W. because Ms. Nutt had previously talked about drinking and smoking marijuana; (2) they believed the fact that Ms. Nutt was eighteen-years-old and S.W. was sixteen "made any physical relationship between them a potential crime;" and (3) the rumors were "causing dissension on the softball team." *Id.* at 6-7.

During the March 3, 2009 confrontation, Defendants argue that they questioned S.W. about the note that started the rumor and asked if she was "involved" with Ms. Nutt. *Id.* at 7. At no point did the Coaches stand over S.W. *Id.* The Coaches also questioned S.W. about who she was riding with to practices. *Id.* S.W. lied and told them that she was riding with her grandmother when she was in fact riding with Ms. Nutt. *Id.* The Coaches then released S.W. *Id.*

The Coaches proceeded to call Ms. Wyatt and asked her to come to the softball field to discuss S.W.'s behavior. *Id.* at 8. During the Coaches' discussion with Ms. Wyatt at the softball field, the Coaches told Ms. Wyatt that S.W. was in an "inappropriate relationship" with Ms. Nutt. *Id.* Defendants argue that the Coaches never used the word "gay" or "lesbian" and only revealed the identity of the person with whom S.W. was involved when Ms. Wyatt asked. *Id.* Defendants further argue that Ms. Wyatt indicated to the Coaches that she knew S.W. was homosexual. *Id.*

Defendants argue that KISD has a policy not to disclose confidential information and provides training to staff regarding the disclosure of confidential information. *See* MOTION at 4. Additionally, Defendants claim that apart from Plaintiff's complaint, no other student or parent has ever alleged that a KISD employee wrongfully disclosed a person's sexual orientation. *Id.* KISD does not have a policy requiring the disclosure of students' sexual orientation, but the policy to which Superintendent Clements was referring to in the Level Two Grievance is a policy to disclose potentially illegal relationships involving students to students' parents. *See* CLEMENTS DEP. at 112-

13.

## LEGAL STANDARD

Summary judgment is appropriate when the record, as a whole, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). A fact is material if it might affect the outcome of the suit under the governing law. *Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999). A "genuine issue" of material fact exists when a fact requires resolution by the trier of fact and a reasonable jury could resolve a factual matter in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

The moving party bears the initial burden of showing absence of a material fact issue, and doubt is resolved against the moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (the court should draw all reasonable inferences in favor of the non-moving party). If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the non-movant's response." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). If the movant meets this burden, Rule 56 requires the opposing party to go beyond the pleadings and to show by affidavits, depositions, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. *EEOC v. Texas Instruments, Inc.*, 100 F.3d 1173, 1180 (5th Cir. 1996); *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1046–47 (5th Cir. 1996).

When ruling on a motion for summary judgment, the Court is required to view all justifiable inferences drawn from the factual record in the light most favorable to the nonmoving party.

*Matsushita*, 475 U.S. at 587; *Adickes*, 398 U.S. at 158-59; *Merritt-Campbell, Inc.*, 164 F.3d at 961. However, the Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *as modified*, 70 F.3d 26 (5th Cir. 1995).  Unless there is sufficient evidence for a reasonable jury to return a verdict in the opposing party's favor, there is no genuine issue for trial, and summary judgment must be granted.  *Celotex*, 477 U.S. at 322-23; *Anderson*, 477 U.S. at 249-51; *Texas Instruments*, 100 F.3d at 1179.

## DISCUSSION

Plaintiff accuses the Coaches of violating S.W.'s right to privacy.  Specifically, Plaintiff argues that the Coaches violated S.W.'s right to keep her sexual orientation private by disclosing her sexual orientation to her mother, Ms. Wyatt.  Plaintiff also accuses KISD of promulgating policies that facilitated this unauthorized disclosure and failing to train its employees on how to handle the confidentiality of a student's sexual orientation.  Defendants move for summary judgment on the grounds of qualified immunity, arguing that the Coaches acted in an objectively reasonable manner and did not knowingly violate S.W.'s right to privacy.  Defendants also move for summary judgment with regards to municipal liability, arguing that KISD properly trained its employees and did not have a policy of disclosing a student's sexual orientation.  These claims will be discussed in turn, beginning with Defendants' qualified immunity claim.

I.    *The Coaches' Qualified Immunity Defense*

The test for qualified immunity requires a two part inquiry: The Court must determine (1) whether a public official's conduct violated a constitutional or statutory right and (2) whether the right was "'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, — U.S.

6

----, 131 S.Ct. 2074, 2080 (2011); *see also Morgan v. Swanson*, 659 F.3d 359, 371-72 (5th Cir.

2011)(en banc).  In determining whether a right was clearly established, courts look to whether the

public official's actions were objectively reasonable in light of the law at the time of the challenged

conduct.  *See Morgan*, 659 F.3d at 370.  Applying the law of qualified immunity to the set of facts

presented here, the Court identifies a multitude of key factual disputes between the parties.  As will

be explained in more detail below, although issues of qualified immunity typically are questions of

law for the courts to decide, at this stage of the proceedings, the Court does not have a set of

undisputed facts to which the law may be applied.  As such, only if both versions of the facts

submitted by the parties dictate that the Coaches' conduct was reasonable or not in violation of a

clearly established right, can this Court find that the Coaches are entitled to qualified immunity.

Because Plaintiff's version of the facts differ significantly from Defendants' version, there are

genuine issues of material fact as to whether the Coaches acted in an objectively reasonable manner

and violated S.W.'s clearly established right to privacy.  Thus, Defendants' motion for summary

judgment on qualified immunity is **DENIED**.

> A.     *There is a Constitutional Right to Prevent the Unauthorized Disclosure of One's*
> *Sexual Orientation*

The Supreme Court and the Fifth Circuit recognize  two branches of substantive due process

privacy rights: autonomy and confidentiality.   The autonomy branch involves "'the interest in

independence in making certain kinds of important decisions[,]' such as those relating to marriage,

procreation, and education." *Zaffuto v. City of Hammond*, 308 F.3d 485, 489 n.4 (5th Cir.

2002)(quoting *Whalen v. Roe,* 429 U.S 589, 599-600 (1977)).  The branch implicated in this case,

however, is the "confidentiality branch" which refers to the Fourteenth Amendment's protection of

the "individual interest in avoiding disclosure of personal matters."  *Id.* (citing *Whalen*, 429 U.S. at

599).  This also includes "the right to be free from the government disclosing private facts about its citizens and from the government inquiring into matters in which it does not have a legitimate and proper concern." *Ramie v. City of Hedwig Village, Tex.*, 765 F.2d 490, 492 (5th Cir. 1985)(citing *Whalen,* 429 U.S. at 599-600).  In evaluating actions under the confidentiality branch, the Fifth Circuit has adopted a balancing test where the constitutionality of the action is determined by comparing the interests it serves with those it hinders.  *Plante v. Gonzalez*, 575 F.2d 1119, 1134 (5th Cir. 1978), *cert. denied*, 439 U.S. 1129 (1979); *see also Coontz v. Katy Independent School Dist.*, No. 98-20188, 1998 WL 698904, at *3 (5th Cir. Sept. 14, 1998)(citing *Plante*, 575 F.2d at 1135) (applying the balancing test to a minor in the school setting).  Thus, "[a]n intrusion into the interest in avoiding disclosure of personal information will thus only be upheld when the government demonstrates a legitimate state interest which is found to outweigh the threat to the plaintiff's privacy."  *Fadjo v. Coon,* 633 F.2d 1172, 1176 (5th Cir. Unit B Jan. 1981).  This balancing test is a question of law for the Court to decide.  *Id; Woodland v. City of Houston*, 940 F.2d 134, 138 (5th Cir. 1991).

### 1.    *S.W. Has a Reasonable Expectation of Privacy in Her Sexual Orientation*

"[W]hether or not personal information is private is a matter of reasonable expectations."*Coontz,* 1998 WL 698904 at *3 (citing *Plante*, 575 F.2d at 1135).  Defendants challenge both whether a student could ever have a reasonable expectation of privacy in his or her sexual orientation and whether S.W. specifically had a reasonable expectation of privacy in her sexual orientation.  *See* Motion at 16-18.  While the Fifth Circuit has never explicitly held that a student has privacy right in keeping his or her sexual orientation confidential, an analysis of existing Supreme Court and Fifth Circuit precedent compels the Court to find such a right.

As an initial matter, Defendants argue in various places throughout their briefing that S.W. could not have had a reasonable expectation of privacy in her sexual orientation because either Ms. Wyatt already knew S.W. was homosexual or S.W. was openly gay in school.  Plaintiff, however, provides sworn testimony from Ms. Wyatt that she did not know S.W. was homosexual until the Coaches told her on March 3, 2009.  *See* RESPONSE at 4 (citing WYATT DECL. at ¶ 7).  Although whether a person has a reasonable expectation of privacy is a question of law, the inquiry relies on a factual foundation that is not developed at this stage in the litigation.  Whether S.W. was openly gay or whether Ms. Wyatt knew she was homosexual prior to the March 3 incident is a question of fact requiring credibility determinations that are best left to the trier of fact.

Turning to the law of privacy, the Supreme Court has found under the auspices of personal autonomy that there is a right to privacy that protects matters related to "marriage, procreation, contraception, family relationships, child rearing, and education."  *Lawrence v. Texas*, 539 US 558, 573-74 (2003)(citations omitted); *see also Klein Independent School Dist. v. Mattox*, 830 F.2d 576, 580 (5th Cir. 1987)(citing *Paul v. Davis*, 424 U.S. 693 , 713 (1976))("Under the autonomy branch of privacy, constitutional protection has been limited to intimate personal relationships or activities, and freedoms to make fundamental choices involving oneself, one's family, and one's relationships with others").  Moreover, in *Lawrence,* the Supreme Court extended the right to privacy to include "intimate conduct."  *Lawrence*,  539 US at 562.  The Court cautioned against "defin[ing] the meaning of [a] relationship or [] sett[ing] its boundaries absent injury to a person or abuse of an institution the law protects."  *Id.* at 567.  Thus, the Court found "[w]hen sexuality finds overt expression in intimate conduct with another person, the conduct can be one element in a personal bond that is more enduring.  The liberty protected by the Constitution allows homosexual persons

9

the right to make this choice." *Id.*  With an understanding that the Supreme Court carefully guards

a person's right to make decisions regarding intimate conduct irrespective of that person's sexual

orientation, the Court now turns to the Fifth Circuit's informational privacy precedent.

While there is no concrete definition of what is personal enough to trigger the confidentiality

branch, binding precedent supports a finding that a person's sexual orientation is of such a highly

personal nature to prevent its unauthorized disclosure.  *See, e.g., ACLU of Miss. v. Miss.*, 911 F.2d

1066, 1070 (5th Cir. 1990)(finding "instances of (often unsubstantiated) allegations of

homosexuality, child molestation, illegitimate births, and sexual promiscuity as well as reports of

financial improprieties, drug abuse, and extreme political religious views" sufficiently personal);

*Fadjo v. Coon*, 633 F.2d 1172, 1174 (5th Cir. Jan. 1981)(finding a legitimate interest in the privacy

of "the most private details of [Fadjo's] life"); *Plante v. Gonzalez,* 575 F.2d 1119, 1121 (5th Cir.

1978)(finding detailed personal financial information sufficiently personal).[2]

Although there is clear precedent that a person has a right to the privacy of sexual

information, the Fifth Circuit has not explicitly held that a person has a right to prevent the

unauthorized disclosure of his or her sexual orientation.  Nevertheless, the Court finds that a

person's sexual orientation is one of "the most private details of [a person's] life" and subject to the

confidentiality analysis.  *See Fadjo*, 633 F.2d at 1174.  This is supported by the Supreme Court's

careful guarding of the right of an individual to make decisions regarding intimate conduct,

irrespective of the sexual orientation of the individual, and the Fifth Circuit's protection of

---

[2] *See also Wolfe v. Shaefer.* 619 F.3d 782, 785 (7th Cir. 2010)("The courts of appeals, including this court, have interpreted *Whalen* to recognize a constitutional right to the privacy of medical, sexual, and perhaps other categories of highly personal information –information that most people are reluctant to disclose to strangers– and have held that the right is defeasible only upon proof of a strong public interest in access to or dissemination of the information.")(collecting cases).

10

information regarding information of a sexual nature. *See Lawrence*, 539 U.S. at 573-74; *ACLU of Miss. v. Miss,* 911 F.2d at 1070.

Several circuits including the Second, Third, Sixth, Ninth, and Tenth circuits have found that such information is intrinsically private. *See Powell v. Schriver*, 175 F.3d 107, 111 (2nd Cir.1999) ("the excruciatingly private and intimate nature of transsexualism, for persons who wish to preserve privacy in the matter, is really beyond debate"); *Sterling v. Borough of Minersville*, 232 F.3d 190 (3rd Cir. 2000) ("It is difficult to imagine a more private matter than one's sexuality"); *Bloch v. Ribar*, 156 F.3d 673, 685 (6th Cir.1998)(publicly revealing information regarding sexuality and choices about sex exposes an aspect of our lives that we regard as personal and private);*Thorne v. City of El Segundo*, 726 F.2d 459, 468 (9th Cir.1983) (the interest raised in the privacy of sexual activities is within the zone of privacy protected by the Constitution); *Eastwood v. Dept. of Corrections*, 846 F.2d 627, 631 (10th Cir.1988) (right to privacy "is implicated when an individual is forced to disclose information regarding personal sexual matters").

While S.W. may have a legitimate interest in preventing the unauthorized disclosure of her sexual orientation, the inquiry does not end there.  The Court must next determine whether the Coaches had a legitimate interest in disclosing that information and whether that State interest outweigh's S.W.'s privacy interest in her sexual orientation.

2.   *The Summary Judgment Evidence Does Not Show that KISD Had a Legitimate Interest in Disclosing S.W.'s Sexual Orientation to Her Mother*

Based on the record before the Court, the Court cannot conclude as a matter of law that Coaches Newell and Fletcher  had a legitimate interest in revealing S.W.'s sexual orientation to her mother that outweighed S.W.'s privacy interest in keeping that information confidential. *See Fadijo*, 633 F.2d at 1176 ("An intrusion into the interest in avoiding disclosure of personal information will

11

thus only be upheld when the government demonstrates a legitimate state interest which is found to outweigh the threat to the plaintiff's privacy").  While the Court is mindful that the balancing inquiry is a question of law, the underlying factual disputes regarding the Coaches' motivations for confronting Ms. Wyatt and the details of the conversation between the Coaches and Ms. Wyatt must be resolved by a trier of fact.  Taking the facts as alleged by Plaintiff, the Court cannot find that Coaches Newell and Fletcher had a legitimate interest in disclosing S.W.'s sexual orientation that outweighed S.W.'s interest in keeping that information private.

"A student's privacy interest is limited in a public school environment where the State is responsible for maintaining discipline, health, and safety . . . .  Securing order in the school environment sometimes requires that students be subjected to greater controls than those appropriate for adults."  *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottowatomie Cnty. v. Earls*, 536 U.S. 822, 830-31 (2002).  Thus, the nature of the school setting generally gives more weight to the state's interest in the privacy analysis.  *See Veronia School Dist. 47J v. Acton*, 515 U.S. 646, 655-56 (1995)("Fourth Amendment rights, no less than First and Fourteenth Amendment rights, are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children").

Defendants argue that "the purpose of [the Coaches] conversation with Barbara Wyatt was . . . to inform her that her sixteen year-old daughter was in a potentially inappropriate and/or illegal relationship with an adult" and that "[w]hatever right Plaintiff had to the confidential to keep the fact that she was dating an adult from her mother was far outweighed by the need to determine whether S.W. was the victim of a crime."  MOTION at 13 (citations omitted).  Defendants contend that the disclosure was warranted because "any sexual relationship with the 16-year-old S.W. and an adult

would have violated Texas' statutory rape laws." *Id.* at 17.  Plaintiff suggests that the Coaches were angry with S.W. for spreading a rumor that she was dating Coach Newell's "ex-girlfriend" and that the "real reason for the disclosure was that [the Coaches] wanted to make Barbara Wyatt aware that her daughter was a lesbian."  RESPONSE at 3, 18.

With regards to the potential crime at issue, Plaintiff argues that the Coaches had no personal knowledge of any sexual contact between S.W. and Ms. Nutt and any belief by the Coaches of that was based on rumor and conjecture.  RESPONSE at 13, 16.  Moreover, while Defendants are technically correct that the Texas' statutory rape law generally makes it a crime for a person eighteen years of age or older to engage in a sexual activity with someone under the age of eighteen, the statute provides a clear and unmistakable affirmative defense for situations such as these.  *See* TEX. PENAL CODE ANN. § 22.011(e) (West 2011) (absolving the actor from liability if the child was 14 years of age or older and the  actor was not  more than three years older than the victim at the time of the offense).  Defendants' argument is further belied by their own actions: Plaintiff provides evidence that "Defendants . . . do not attempt to notify parents or authorities when heterosexual students [of] 16 years of age or less have romantic relationship with 18 year olds."  RESPONSE at 17 (citing GEORGE DEP. at 60-62; CLEMENTS DEP. at 21-26).

Thus, from the evidence presented by Plaintiff, a reasonable person could conclude that the Coaches were not motivated by the need to protect S.W. but rather were retaliating against S.W. for spreading a rumor about Coach Fletcher.  Moreover, the state has no interest in retaliating against students, no matter how difficult to coach or teach they are.  Additionally, even if the Coaches were motivated by a desire to protect S.W., Plaintiff provides expert testimony based on Plaintiff's version of the facts that the Coaches actions "were not a reasonable response to any potential

concerns they may have had regarding S.W. or her welfare." *Id.* (quoting EXHIBIT M TO RESPONSE, DECLARATION OF KRISTINE VOWELS (Doc. No. 54-13)("VOWELS DECL."), at 5). As a result, based on the record before the Court, the Court cannot find that the states' interest outweighs S.W.'s right to keep her sexual orientation confidential.

### B. S.W.'s Rights Were Clearly Established at the Time of the Incident

The Fifth Circuit, sitting en banc, recently explained the proper analysis for determining whether a right was clearly established for the purposes of the qualified immunity analysis:

> When considering a defendant's entitlement to qualified immunity, we must ask whether the law so clearly and unambiguously prohibited his conduct that "every 'reasonable official would understand that what he is doing violates [the law].'" *Al-Kidd,* 131 S.Ct. at 2083 (emphasis added)(citing *Andersen v. Creighton,* 483 U.S. 635, 640 (1987)). To answer that question in the affirmative, [the court] must be able to point to controlling authority—or a "robust 'consensus of persuasive authority' "—that defines the contours of the right in question with a high degree of particularity. *Id.* at 2084 (citing *Wilson v. Layne,* 526 U.S. 603, 617 (1999)).

*Morgan*, 659 F.3d at 371-372. Moreover, "[w]here no controlling authority specifically prohibits a defendant's conduct, and when the federal circuits are split on the issue, the law cannot be said to be clearly established." *Id.* (citing *Wilson*, 526 U.S. at 617-18). As explained above, although the Fifth Circuit has never explicitly held that a person has a privacy interest in keeping his or her sexual orientation confidential, Fifth Circuit and Supreme Court precedent clearly supports such a finding. Moreover, there is a "robust consensus of persuasive authority" supporting the conclusion that a person has a privacy interest in his or her sexual orientation.[3] *See id.*

---

[3]Defendants fail to identify a circuit split. The Court notes that the Fourth Circuit rejected a claim that a questionnaire containing queries about homosexual sexual encounters violated the plaintiff's privacy. *Walls v. City of Petersburg*, 895 F.2d 188, 193 (4th Cir. 1990). The court found that a person's sexual activities are not within the "zone-of-privacy" protected from unwarranted government intrusion. *Id.* In doing so, the Fourth Circuit relied exclusively on *Bowers v. Hardwick* for the proposition that "the [Supreme] Court explicitly rejected 'the proposition that any kind of private sexual conduct between consenting adults is constitutionally insulated from state proscription.'" *Id.* (quoting *Bowers v. Hardwick*, 478 U.S. 186, 190 (1986)). *Lawrence v. Texas* explicitly overruled *Bowers*, finding that private sexual conduct between consenting adults are, in fact, insulated from state proscription.

Although the Court finds that S.W.'s right to privacy was clearly established at the time of the incident, the Court cannot make a determination that the Coaches acted in an objectively reasonable or unreasonable manner because of the factual disputes between the parties.  The Court acknowledges that in the school setting, what is "reasonable" is often given more leeway because of the unique circumstances of public education.  *See Veronia School Dist. 47J v. Acton*, 515 U.S. 646, 655-56 (1995)("Fourth Amendment rights, no less than First and Fourteenth Amendment rights, are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children").While the qualified immunity inquiry is a question of law for the Court,  there are substantial unresolved questions of fact surrounding the circumstances leading up to and the content of the Coaches conversation with Ms. Wyatt that prevent the Court from making a qualified immunity determination.  For example, whether the Coaches' disclosed S.W.'s sexual orientation as retaliation for S.W.'s conduct, whether they disclosed the identity of Ms. Nutt without provocation by Ms. Wyatt, and the words they used to describe the relationship may play a role in determining the "reasonableness" of their conduct. Without a factual determination by the appropriate trier of fact, this Court cannot resolve the legal question as to whether the Defendants' actions are amenable to a qualified immunity defense on this claim.

## II.  Municipal Liability

In general, "municipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)(quoting *Monell*

---

*See Lawrence,* 539 U.S. at 562, 578.

*v. Dept. of Social Servs* , 436 U.S. 658, 694 (1978)).  Plaintiff argues KISD is liable under § 1983

under two theories: (1) KISD has a policy requiring disclosure of students' sexual orientation to their

parents; and (2) KISD failed to train its employees on disclosure of sexual orientation of a student

which led to Fletcher and Newell soliciting this information from S.W. and then disclosing it to her

mother.  RESPONSE at 10-11.  As will be explained below, the ultimate determination of liability

rests on unresolved questions of fact that are better left to the trier of fact and prevent the Court from

making a determination on municipal liability at this time.

> A.     *Plaintiff Has Identified Substantial Questions of Material Fact With Regards to a Policy of Disclosing Sexual Orientation*

Plaintiff may establish municipal liability by proving three elements: "a policymaker; an

official policy; and a violation of constitutional rights whose 'moving force' is the policy or

custom."  *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)(quoting *Monell v. Dept.*

*of Social Servs.*, 436 U.S. 658, 694 (1978)).  An official "policy" need not be in writing nor establish

a fixed plan to be followed in similar circumstances. *Pembaur v. City of Cincinnati*, 475 U.S. 469,

480-81 (1986).  Indeed, "a government frequently chooses a course of action tailored to a particular

situation and not intended to control decisions in later situations."  *Id.*  Provided that this course of

action is properly made by an authorized final decision maker, it represents an act of government

policy for the purposes of § 1983.  *Id.* at 1981.  The Fifth Circuit has held that a school Board of

Trustees' single  action constitutes a "policy" attributable to the school district potentially exposing

the district to liability under § 1983.  *See Gonzalez v. Ysleta Independent School District*, 996 F.2d

at 754 ("The Board's decision . . . represents a final action by the entity charged with making and

executing policy within the school district").

Plaintiff alleges the Coaches were acting in accordance with an official policy promulgated

by the KISD Board requiring teachers to disclose students' sexual orientation to their parents.  *See* RESPONSE at 11-12.  According to Plaintiff, this policy was unwritten prior to the  March 3 incident but was "put in writing" by Superintendent Clements' written response to Ms. Wyatt's Level Two grievance.  *Id.* at 12.  This, in turn, was ratified by the School Board without opinion, which Plaintiff argues "confirms the existence of a facially unconstitutional policy . . . ."  RESPONSE at 14-15.  Plaintiff also argues that the Board's ruling on the Level Three grievance is separately sufficient to establish the existence of an official policy.[4]

Plaintiff argues that "[a]t the Level Two complaint and hearing, Defendants' formal justification provided for Fletcher and Newell's nonconsensual disclosure of S.W.'s sexual orientation was that they were 'legally obligated to share this information with the parent.'"  RESPONSE at 5 (citing CLEMENTS DEP.  at 112-13).  The relevant portion of the Level Two Grievance response reads as follows:

> In your Grievance you stated that you wanted all unethical conduct reported.  I will address the Employee Standard of Conduct violations that you feel were violated.
> ...
> **Section 3.1 The educator can not reveal confidential information concerning students unless disclosure serves lawful professional purposes or is required by law.**  Coach Fletcher and Newell are legally obligated to share this information with the parent.  To my knowledge no one else was given this information except for school officials.  The athletes I interviewed never stated that the coaches divulged any information about the details of why [S.W.] was no longer on the team.

Ex. P to RESPONSE (Doc. No. 54-16) at 4 (underlining added).  The statement on its face does not

---

[4]The Court notes that because Plaintiff must show that the "moving force" of the constitutional violation of S.W.'s rights was the official policy, Plaintiff must show that the policy was in existence prior to the incident. Even assuming *arguendo* that the School Board's action constituted an adoption of an official policy that teachers are required to disclose the sexual orientation of students to their parents, it is logically impossible for this policy to have been the moving force behind the incident that occurred before the policy was enacted.  Thus, Plaintiff's policy claim rests on whether there was an existing policy.

indicate that the school district believed it was obligated to disclose S.W.'s sexual orientation, however it suggests the existence of a policy requiring the Coaches to share some "confidential information" with S.W.'s parent.

Defendants present testimony from Superintendent Clements and KISD School Board president Terry George that KISD does not have a policy of requiring staff to disclose students' sexual orientation to their parents. MOTION at 4 (citing CLEMENTS DEP. at 112; GEORGE DEP. at 56). Defendants provide testimony from Superintendent Clements, the author of the Level Two grievance report, explaining the context of the statement that "Coach Fletcher and Newell are legally obligated to share this information with the parent:"

> Q:    . . .What did you refer to when you were talking about Coach Fletcher and Newell are legally obligated to disclose this information?
>
> A:    I was referring to the situation where we had an adult and a minor that could possibly be involved with each other that were riding around in the car, and we felt like we had a legal obligation, because it's an adult and a minor, to report that.
>
> Q:    Did you ever – were you referring in any way to them having to disclose her sexuality --
>
> A:    No.
>
> Q:    – or her sexual orientation?
>
> A:    No, just referring to the fact it was an adult and child.

CLEMENTS DEP. at 112-13.  Thus, Defendants' appear to be arguing that the policy was not one of disclosing students' sexual orientation, but rather informing parents when their minor child is "possibly involved with" an adult  *See id.*

Plaintiff counters that KISD's belief that it was legally obligated to disclose S.W.'s relationship because of the adult/child relationship is disingenuous.  *See* RESPONSE at 17-18.

According to the summary judgment evidence, KISD does not investigate nor has it ever reported to authorities or parents when students 16 or younger have romantic heterosexual relationships with 18 year olds.  *See id.* at 17.  As such, Plaintiff suggests that this was merely a post-hoc rationalization of Newell and Fletcher's conduct.  *See id.* at 17-18.

As the above discussion indicates, whether KISD has a policy requiring staff to disclose students' sexual orientation to their parents ultimately rests on the credibility of Superintendent Clements and Mr. George.  Although Defendants' claim that it is KISD's policy not to disclose confidential information, Defendants nevertheless argue that it is their policy to disclose to parents when their minor children are in relationships with "adults."  Despite this policy, KISD or its staff has never reported to parents when sixteen year old students have heterosexual relationships with eighteen year olds.  Thus, because the determination of whether or not KISD has a policy requiring the disclosure of students' sexual orientation would require the Court to evaluate the credibility of Defendants' witnesses, summary judgment as to this prong of the municipal liability analysis is improper.

### B.  *Plaintiff's Failure-to-Train Theory*

The Supreme Court recently summarized what a plaintiff must show to prove municipal liability under a failure to train theory.  *See Connick v. Thompson*, — U.S. — . 131 S. Ct. 1350, 1359-60 (2011).  In *Connick*, the Court explained "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for the purposes of § 1983."  *Connick,* 131 S. Ct. at 1359; *see also Valle v. City of Houston*, 613 F.3d 536, 544 (5th Cir. 2010) ("The failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for

19

which the city may be held liable if it actually causes injury")(citation omitted).  The Fifth Circuit's

three part test for a failure to train claim requires that a plaintiff show "(1) the municipality's

training policy or procedure was inadequate; (2) the inadequate training policy was a 'moving force'

in causing violation of the plaintiff's rights; and (3) the municipality was deliberately indifferent in

adopting its training policy."  *Valle*, 613 F.3d at 544.

In *Connick*, the Supreme Court explained that

> [D]eliberate indifference is a stringent standard of fault, requiring proof that a
> municipal actor disregarded a known or obvious consequence of his action.  Thus,
> when city policymakers are on actual or constructive notice that a particular omission
> in their training program causes city employees to violate citizens' constitutional
> rights, the city may be deemed deliberately indifferent if the policymakers choose to
> retain that program.

*Connick*, 131 S. Ct. at 1360 (quotation marks and citations omitted).  Lastly, "[a] less stringent

standard of fault for a failure to train claim 'would result in *de facto respondeat superior* liability

on municipalities ....'"  *Id.* (quoting *Canton*, 489 U.S. at 392).  Thus, "[a] municipality's culpability

for deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Id.* (citing

*Oklahoma City v. Tuttle*, 471 U.S. 808, 822-823 (1985)).

To prove deliberate indifference, Plaintiff must show either a pattern of similar violations

of students' privacy rights regarding their sexual orientation or the "obvious need for specific legal

training" to prevent the "highly predictable consequence" of violating students' privacy rights with

regards to their sexual orientation.  *See Connick,* 131 S.Ct. at 1360-61.  In this case, Plaintiff alleges

that "[t]he disclosure of [Plaintiff's] sexual orientation to her mother was an inevitable consequence"

of KISD's failure to provide guidance specifically related to the confidentiality of a student's sexual

orientation.  MOTION at 12-13.   Defendant counters that its training covering confidential

information is sufficient, even though it does not address a student's sexual orientation.

20

Even if Plaintiff fails to show a pattern of similar violations, Plaintiff can still succeed in showing that KISD had "constructive notice" that its training was insufficient by showing the "obvious need for specific legal training" to prevent the "highly predictable consequence" of violating students' privacy rights with regards to their sexual orientation.  *See Connick,* 131 S.Ct. at 1360-61. In rare cases, "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under §1983 without proof of a preexisting pattern of violations." *Connick,* 131 S.Ct. at 1361.  In *Canton,* the Supreme Court hypothesized that "a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force" would likely be subject to liability.  *Id.* (citing *Canton,* 489 U.S. at 390, n. 10).  Liability stemmed from the "'predictability that an officer lacking specific tools to handle that situation would violate citizen's rights'" because absent training, "there is no reason to assume that police academy applicants are familiar with the constitutional constraints on the use of deadly force."  *Id.* (quoting *Board of Comm'rs of Bryan Cty. v. Brown,* 520 U.S. 397, 409 (1997)).

Although Plaintiff only identifies a single specific instance where the sexual orientation of a student was potentially at issue, Plaintiff identifies a series of incidents that could reflect deliberate indifference towards issues involving sexual orientation.  Plaintiff alleges that "KISD teachers told [S.W.], 'Tonight is not a night for alternative lifestyles' when she arrived at prom with a female date, and refused to let her in."  RESPONSE at 14 (citing S.W. DEP. at 111).  Superintendent Clements was aware of the incident and while he stated that KISD has always allowed same sex couples to attend prom, he did not feel the need to announce such a policy even where there was confusion at the dance.  *Id.* (citing CLEMENTS DEP. at 105).  Moreover, Plaintiff further argues that Superintendent

21

Clements "expressed further indifference to providing training on policies specifically protecting sexual orientation, claiming that, if the district offered such training, 'there's [sic] going to be 10 or 12 other groups that want a specific thing they have.'" *Id.* (citing CLEMENTS DEP. at 95).

The awareness that there was at least some confusion among KISD staff regarding their approach issues involving the sexual orientation of students combined with Superintendent Clements' statement implying that additional safeguards or training would too burdensome may rise to the level of deliberate indifference. The risk of the inappropriate disclosure of a students' sexual orientation is exacerbated by the potential existence of a policy requiring staff to inform parents when their sixteen-year old students are dating eighteen year olds. As explained above, it appears that KISD makes no effort to investigate or inform parents when students are in similar heterosexual relationships. It is not unforeseeable that armed only with this policy and no training regarding the confidential nature of a students' sexual orientation or the proper steps to take in order to ensure the safety of the child at issue, an incident like the March 3 incident would occur. In sum, Plaintiff provides enough evidence from which a reasonable person could conclude that KISD was deliberately indifferent towards the need for additional training regarding the confidentiality of students' sexual orientation.

III.    *Defendants' Remaining Arguments*

Defendants also move for summary judgment alleging that Plaintiff failed to exhaust her administrative remedies. *See* MOTION at 32-33. Defendants claim that because Ms. Wyatt did not timely file her initial grievance, her complaint should be dismissed. *Id.* While Ms. Wyatt's initial complaint was dismissed as time barred, she pursued her claims through KISD's proscribed appeal process where Superintendent Clements and the Board substantively addressed her claims. *See*

RESPONSE at 9-10; *id.* at 4-5.  Thus, the Court finds that Plaintiff's claims are not barred for failure to exhaust administrative remedies and **DENIES** Defendants' motion for summary judgment on this issue.

Defendants' also move for summary judgment on the grounds of qualified immunity with regards to Plaintiff's false imprisonment claims.  As explained above, there remains a genuine material issue of fact as to whether there was an objectively reasonable basis for the Coaches' actions including factual disputes over what transpired behind the closed doors of the locker room. This factual dispute is highlighted by the parties' competing expert testimony where the experts came to opposite conclusion when presented with only one party's version of the facts.  *See* EX. 15 TO MOTION, AFFIDAVIT OF MIKE MOSES (Doc. No. 41-15), at 1-2, 7-8 (finding the Coaches' conduct objectively reasonable based on Defendants' version of the facts); VOWELS DECL. at 4-5 (finding that Coaches' treatment of S.W. in the locker room was "hostile and unjustified" based on Plaintiff's version of the facts).  Thus, the Court finds that the defendants are not entitled to qualified immunity on this claim at this time and **DENIES** Defendants' motion.

## CONCLUSION

For the aforementioned reasons, the Court **DENIES** Defendants' Motion for Summary Judgment.

**So ORDERED and SIGNED this 30th day of November, 2011.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE

23